ENVIRONMENTAL DEFENSE
FUND, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

The ELECTRONIC INDUSTRIES ASSO-
CIATION'S AD HOC PCB COMMIT-
TEE and Westinghouse Electric Corp.,
Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

BASS ANGLERS SPORTSMAN SOCIE-
TY OF AMERICA, Petitioner,

v.

Douglas M. COSTLE, Administrator,
United States Environmental Pro-
tection Agency, Respondent.

Nos. 77–1091, 77–1317 and 77–1462.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 24, 1978.

Decided Nov. 3, 1978.

Rehearing Denied Dec. 14, 1978.

Rehearing Denied in No. 77–1462
Dec. 14, 1978.

**64**

———

Jacqueline M. Warren, Washington, D. C.,
with whom John F. Hellegers and William
A. Butler, Washington, D. C., were on the
brief, for petitioner in No. 77 1091.

Peter J. Nickles, Washington, D. C., with
whom Steven S. Rosenthal, John Michael
Clear, and Roger E. Wills, Jr., were on the
brief, for petitioners in No. 77 1317.

Andrew Robert Greene, Atlanta, Ga.,
with whom Henry Angel, Atlanta, Ga., was
on the brief, for petitioner in No. 77-1462.

Lorraine Chang, Atty., Environmental
Protection Agency, Washington, D. C., with
whom Ridgway M. Hall, Jr., Associate Gen.
Counsel, Environmental Protection Agency,
James W. Moorman, Acting Asst. Atty.
Gen., and Douglas K. Miller, Atty., Dept. of
Justice, Washington, D. C., were on the
brief, for respondents. Peter R. Taft and
William L. Want, Attys., Dept. of Justice,
Washington, D. C., also entered appear-
ances for respondents.

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | FACTS AND PRIOR PROCEEDINGS. | 65 |
| | A. *Factual Background on PCBs.* | 65 |
| | B. *PCBs Proceedings.* | 68 |
| II. | STATUTORY FRAMEWORK. | 71 |
| III. | PROCEDURAL CHALLENGES. | 74 |
| IV. | INTERACTION WITH TOXIC SUBSTANCES CONTROL ACT. | 76 |
| V. | EVIDENTIARY BASIS FOR REGULATION OF LESS CHLORINATED PCBs. | 78 |
| | A. *Arguments of the Parties.* | 78 |
| | B. *Applicable Legal Standards.* | 79 |
| | C. *Scope of Review.* | 82 |
| | D. *Adequacy of the Basis for EPA Regulations.* | 83 |
| | 1. EPA's policy judgments concerning extrapolation. | 83 |
| | 2. EPA's factual determination of the particular risks here. | 85 |
| | a. Toxicity | 85 |
| | i. Aquatic organisms | 86 |
| | ii. Man | 86 |
| | iii. Carcinogenicity | 87 |
| | b. Persistence | 89 |
| | c. Degradability | 89 |
| | 3. Conclusion. | 90 |
| VI. | PETITIONS BY EDF AND BASS. | 90 |
| | A. *Petition by EDF.* | 90 |
| | B. *Petition by Bass.* | 91 |
| VII. | CONCLUSION. | 91 |

Before TAMM and ROBINSON, Circuit Judges, and CHARLES R. RICHEY,* United States District Judge for the District of Columbia.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

We are called upon in these consolidated cases to review challenges to the Environmental Protection Agency's (EPA) first regulations prohibiting discharge into the nation's waterways of a toxic substance, polychlorinated biphenyls (PCBs), under the Federal Water Pollution Control Act Amendments.[1] For the reasons that follow, we uphold the EPA's regulations.

This section was amended by section 53 of the Clean Water Act of 1977, 33

U.S.C.A. § 1317(a) (1977); see text at — · .— ——, ————— of —— U.S.App. D.C., at 71, 73–74 of 598 F.2d infra. See also Hercules, Inc. v. EPA, (D.C.Cir. 1978), — U.S.App.D.C. —— at ——-——, 598 F.2d 91 at 100–102; Federal Water Pollution Control Act Amendments of 1972 (1972 Act or the Act), 33 U.S.C. §§ 1251–1376 (1976).

## I. FACTS AND PRIOR PROCEEDINGS.

### A. Factual Background on PCBs.

PCBs are a group of related chlorinated hydrocarbon chemicals useful in several industrial processes and toxic to a wide variety of organisms, including man. The chemistry of PCBs figures prominently in this case and will be discussed below. At this point, we need note only that PCBs fall into two chemical categories: PCBs with a low

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Section 307(a) of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1317(a) (1976), provides as follows:

(1) The Administrator shall, within ninety days after October 18, 1972, publish (and from time to time thereafter revise) a list which includes any toxic pollutant or combination of such pollutants for which an effluent standard (which may include a prohibition of the discharge of such pollutants or combination of such pollutants) will be established under this section. The Administrator in publishing such list shall take into account the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms.

(2) Within one hundred and eighty days after the date of publication of any list, or revision thereof, containing toxic pollutants or combination of pollutants under paragraph (1) of this subsection, the Administrator, in accordance with section 553 of Title 5, United States Code shall publish a proposed effluent standard (or a prohibition) for such pollutant or combination of pollutants which shall take into account the toxicity of the pollutant, its persistence, degradability, the use or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms, and he shall publish a notice for a public hearing on such proposed standard to be held within thirty days. As soon as possible after such hearing, but not later than six months after publication of the proposed ef-

fluent standard (or prohibition), unless the Administrator finds, on the record, that a modification of such proposed standard (or prohibition) is justified based upon a preponderance of evidence adduced at such hearings, such standard (or prohibition) shall be promulgated.

(3) If after a public hearing the Administrator finds that a modification of such proposed standard (or prohibition) is justified, a revised effluent standard (or prohibition) for such pollutant or combination of pollutants shall be promulgated immediately. Such standard (or prohibition) shall be reviewed and, if appropriate, revised at least every three years.

(4) Any effluent standard promulgated under this section shall be at that level which the Administrator determines provides an ample margin of safety.

(5) When proposing or promulgating any effluent standard (or prohibition) under this section, the Administrator shall designate the category or categories of sources to which the effluent standard (or prohibition) shall apply. Any disposal of dredged material may be included in such a category of sources after consultation with the Secretary of the Army.

(6) Any effluent standard (or prohibition) established pursuant to this section shall take effect on such date or dates as specified in the order promulgating such standard, but in no case more than one year from the date of such promulgation.

(7) Prior to publishing any regulations pursuant to this section the Administrator shall, to the maximum extent practicable within the time provided, consult with appropriate advisory committees, States, independent experts, and Federal departments and agencies.

chlorine content (less chlorinated PCBs) and PCBs with a high chlorine content (more chlorinated PCBs). More chlorinated PCBs have been manufactured and used since 1929. For decades, they served in a variety of industrial uses such as ink solvents, plasticizers, adhesives, and textile coatings,[2] but their principal use was and is in electrical equipment. PCBs are nonflammable liquids that are highly resistant to electrical current. Therefore, they have been widely used to fill electrical devices such as capacitors and transformers, aiding in the storage of electrical charge without creating the fire hazard that would occur if a flammable filler were used.

Awareness of the danger from PCBs to the environment and to man was slow to develop. Although large quantities of PCBs were manufactured and leaked into the environment, the PCBs detected in the environment were long mistaken for pesticide residues, which they resemble chemically. It was not until the mid-1960's that the presence of PCBs in the environment and the harm they inflict were recognized and distinguished from the pesticide problem.[3] As we shall discuss below, it became apparent from scientific studies that more chlorinated PCBs built up to dangerous levels in the sediments of waterways, in the water, in fish, and ultimately in humans, creating a serious risk of death for aquatic organisms and disease (particularly cancer) for man.

In 1971-72, in response to public and government pressure, PCBs manufacturers and users took initial steps to reduce the PCBs danger.[4] Manufacture was shifted from the more chlorinated PCBs to the less chlorinated PCBs, because it was hoped that less chlorinated PCBs were less dangerous. PCBs use was limited to closed electrical equipment, where the need was greatest and the leakage was least. Some effort was made to control discharge of PCBs into waterways.

However, in 1972-74 manufacturers were curtailing their efforts to find acceptable substitutes for PCBs,[5] and manufacture of less chlorinated PCBs continued at high volumes, e. g., forty million pounds in 1974. 42 Fed.Reg. 6533 (1977). EPA's initial effort to control discharge of PCBs into waterways, the precursor of the proceeding now on review, ended in failure in 1973–74.[6] Discharges of PCBs into the nation's waterways continued.

Developments in the early and mid-1970's heightened the public concern about PCBs and resulted in new regulatory efforts in late 1975 and early 1976. Monitoring of residues in fish revealed that industrial discharges of PCBs were rendering fish in many waterways unhealthy for human consumption.[7] This monitoring culminated in

---

2. Seventh Annual Report of the Council on Environmental Quality 44 (1976).

3. Comment, *Federal Toxics Control: The Patchwork Attack on PCBs,* 6 Envir.L.Rep. (Envir.Law Inst.) 10056, 10056 & nn.1 & 2 (1976).

4. *See, e. g.,* Federal Interagency Task Force on PCBs, Polychlorinated Biphenyls and the Environment (1972).

5. *See, e. g.,* Appendix (App.) I 475-76 (testimony of N. R. Clark of Universal Manufacturing Corp., a capacitor manufacturer).

6. This failure is discussed at text accompanying notes 17-19 *infra.*

7. PCBs discharged into the waterways by manufacturers of PCBs and electrical equipment constitute only a small part of the total discharge and emission of PCBs into the environment. It is estimated that about ten million pounds of PCBs enter the environment yearly, mainly through vaporization, leaks, and spills. *See* Comment, *supra* note 3, 6 Envir.L.Rep. (Envir.Law Inst.) at 10057. It is estimated that about ten thousand pounds of PCBs are discharged yearly into the nation's waterways by manufacturers of PCBs and electrical equipment, with direct discharges accounting for less than one-third of this amount. 41 Fed.Reg. 30469 (1976); App. I 28. However, such discharges have greater significance than their small part of the total would suggest, because these discharges occur at fixed geographic points in concentrated form supplementing previous discharges, whereas other types of PCBs leakage into the environment occur from non-point sources in diffuse form. For example, the facility involved in the *General Electric* case created a health hazard by discharging little more than *two pounds of PCBs per day* at the time of suit. *General Electric Co.,* 6 Envir.L.Rep. (Envir.Law Inst.) 30007, 30010 (1976).

a state proceeding, *General Electric Co.*, 6 Envir.L.Rep. (Envir.Law Inst.) 30007 (1976), in which New York's Department of Environmental Conservation found that discharges of PCBs by General Electric, a major manufacturer of electrical equipment containing PCBs, had rendered most upper Hudson River fish dangerous to eat. *Id.* at 30017 18. Similar situations threatened the fishing industry in the Great Lakes and elsewhere.

While the *General Electric* case was pending, a national conference on PCBs hazards was held in November 1975 that resulted in greater awareness of. the nationwide threat posed by PCBs and contributed to the renewed EPA effort to regulate and control PCBs discharges.[8] The EPA regulations now on review are the culmination of that effort.

Following the 1975 renewal of EPA's regulatory effort, further information accumulated with respect to the health hazards posed by PCBs. Moreover, substitutes for PCBs were developed in this country and in

Japan that would serve adequately in electrical equipment without creating a fire hazard.[9] Congress became impatient and wrote a special provision devoted solely to PCBs into the Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601 2629 (1976). *See* section 6(e), 15 U.S.C. § 2605(e) (1976). Considering that there are few statutes aimed so particularly at control of an individual chemical, we construe this provision as a significant comment on the failure of existing regulatory mechanisms.[10] Failure of existing regulatory mechanisms to control PCBs contributed materially both to passage of the preventive sections of the Toxic Substances Control Act and to strengthening, in 1977, of the toxics provision of Federal Water Pollution Control Act Amendments of 1972. *See* 33 U.S.C.A. § 1317(a) (1977).[11]

Further, the failures in initial efforts at controlling PCBs were a major factor in new administrative initiatives. During the late 1960's and early 1970's, the Food and Drug Administration,[12] the Occupational

---

**8.** *See* 6 Envir.Rep. (BNA) 1307, 1331, 1441 (1975).

**9.** Adequate substitutes for PCBs include phthalate esters, high flash point mineral oils, and silicones, augmented by protective devices. Some of these are already in use in Japan. *See* 42 Fed.Reg. 6545 46 (1977); App. I 444, 448 49, 454, 458, 465 (industry testimony); App. I 37–56 (agency documents).

**10.** Senator Nelson, who introduced the amendment that created section 6(e), 15 U.S.C. § 2605(e) (1976), stated that "[i]t is preferable not to enact legislation on a substance-by-substance basis but rather generically, as the Toxic Substances bill proposes to do. However, the PCB problem shows no sign of abating and it has become so severe that it is necessary to address the problem head on, as we were forced to do with DDT." 122 Cong.Rec. S4408 09 (daily ed. Mar. 26, 1976); *see id.* at S4407.

**11.** Legislators, administrators, and commentators pointed to the course of PCBs regulation as a failure indicating a need for new preventive regulation. *See, e. g.,* Seventh Annual Report of the Council on Environmental Quality 46 (1976) ("PCBs are an example of substances for which a new regulatory approach is needed."); Comment, *supra* note 3, at 10058; 6 Envir.L.Rep. (Envir.Law Inst. BNA) 1332 (1975)

(address by Asst. Secretary of the Interior for Fish and Wildlife); note 10 *supra*; Federal Interagency Task Force on PCBs, *supra* note 4, at 3. PCBs were a major factor in passage of the Chemical Substances Control Law of 1973 in Japan. *See* Star, *American and Japanese Controls on Polychlorinated Biphenyls (PCBs)*, 1 Harv.E.L.Rev. 561 (1976).

In this respect, the PCBs problem played a part in generating public support for strengthened regulation of toxic substances in the 1970's similar to the part that problems with adulterated food played in generating public support for food and drug regulation at the turn of the century, and that problems with hazardous drugs played in generating public support for strengthened drug regulation in the 1930's and 1960's. *See generally* Food and Drug Act of 1906, c. 3915, 34 Stat. 768; Federal Food, Drug, and Cosmetic Act of 1938, ch. 675, 52 Stat. 1040; Drug Amendments of 1962, Pub. L.No.87 871, 76 Stat. 780; U. Sinclair, The Jungle (1906); Note, *Drug Efficacy and the 1962 Drug Amendments*, 60 Geo.L.J. 185, 186 & n.13, 191 & n.45 (1971) (describing the impact on drug laws of the sulfanilamide disaster in the 1930's and the thalidomide disaster in the 1960's).

**12.** *See, e. g., Natick Paperboard Corp. v. Weinberger*, 498 F.2d 125 (1st Cir. 1974).

Safety and Health Administration,[13] and EPA had made independent efforts to control PCBs, none of them wholly successful. This lack of success stimulated a new effort at interagency cooperation in toxics regulation, and was a major factor in the development of EPA's large-scale program for regulation of discharges of toxic substances, including PCBs.[14]

## B. *PCBs Proceedings.*

We set forth the history of EPA's PCBs proceedings in detail because it bears on both the posture of this appeal and the interpretation of the statutes that Congress passed in 1976 and 1977. In sum, the history of EPA's PCBs proceedings is a history of frustration of a congressional mandate for action. Regulatory steps that Congress expected to take little more than *one* year took *four* years.

On October 18, 1972, Congress enacted the Federal Water Pollution Control Act Amendments of 1972 (1972 Act or the Act), 33 U.S.C. §§ 1251–1376 (1976). The 1972 Act prescribed a rigid schedule for promulgation of effluent standards for toxic substances. Section 307(a), 33 U.S.C. § 1317(a) (1976),[15] directed EPA to publish a list of toxic substances within ninety days, propose effluent standards for the listed substances within 180 days after listing, and promulgate final effluent standards within six months after the proposed standards. Thus, EPA was to promulgate toxic effluent regulations by early 1974.

In May 1973, after EPA failed to meet its first deadline, the Natural Resources Defense Council, Inc. (NRDC) sued EPA to hasten EPA action and bring about publication of a toxic substances list. This suit ended in a consent decree in June 1973, fixing a timetable for EPA. *NRDC v. Fri,* 3 Envir.L.Rep. (Envir.Law Inst.) 20587 (D.D.C.1973). Pursuant to this timetable, EPA issued, in July 1973, a proposed list of nine toxic substances, including PCBs, 38 Fed.Reg. 18044 (1973), and, in September 1973, a final list of the same nine substances. 38 Fed.Reg. 24342 (1973). In December 1973, EPA proposed standards for the nine substances. 38 Fed.Reg. 35388 (1973).[16] In April and May 1974, EPA held an evidentiary hearing on the proposed standards in which numerous objecting parties participated.

However, after the hearing, EPA failed to promulgate final standards for any of the nine substances. There were several causes for this failure. EPA contended that it lacked sufficient data to set regulations that would survive judicial review.[17] Congressmen later expressed their belief

---

**13.** *See* Star, *supra* note 11, 1 Harv.E.L.Rev. at 566.

**14.** *See, e. g.,* Interagency Agreement on Regulation of Toxic and Hazardous Substances, 42 Fed.Reg. 54856 (1977); text *infra* at of 194 U.S.App.D.C., at 70 of 598 F.2d.

**15.** For a related explanation of the regulatory scheme, *see NRDC v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692 (1974). Section 307(b) governs pretreatment standards for publicly owned treatment works. *See* 33 U.S.C. § 1317(b) (1976).

**16.** In its proposed regulations, EPA set forth its initial construction of the statute. Although in large part EPA retained that construction in subsequent proceedings, it changed its view in one significant respect: its initial view was that economic data and availability of treatment technology played no part in setting toxic standards, 38 Fed.Reg. 35389 (1973), while later it tried to carve out a minimal role for economic and technological feasibility data. *See Hercu-*

*les, Inc. v. EPA,* 194 U.S.App.D.C. at --- ---, 598 F.2d at 113 114.

**17.** EPA stated later that "[t]he hearing record, though voluminous, did not contain sufficient evidence upon which defensible standards could be promulgated. . . . Faced with the choice between (a) promulgating standards on an insufficient record which were subject to almost certain challenge in court with the likely result of protracted litigation followed by a remand, or (b) taking the time to gather additional data to fill the gaps and make a fresh proposal, the Agency has elected the latter course as the more responsible." 41 Fed.Reg. 23577 (1976) (proposing new rulemaking).

In congressional testimony, an EPA official focused more precisely on the basic data problem—Congress had overestimated the available data on toxic substances:

In requiring EPA to publish within 90 days of passage of the Act a list of toxic pollutants to be regulated under this section, Congress apparently assumed the existence of a substan-

that the procedures employed by EPA substantially impeded effective regulation due to their excessive complexity and formality.[18] Finally, EPA experienced difficulty in responding to the many concerns raised by industry representatives at the hearing. Some of those concerns had little bearing on regulation,[19] but others were weighty.[20]

EPA's failure to promulgate any toxic standards triggered a waive of suits by environmental groups seeking to compel EPA to promulgate regulations for PCBs and other toxic substances.[21] Before those suits could be resolved, EPA developed a new approach to toxics regulation, and negotiated a consent decree with the environmental groups that was accepted, with modifications in June 1976, by the United States District Court for the District of Columbia. *NRDC v. Train*, 8 ERC (BNA) 2120, 2122 (1976) ("Flannery decree"), *rev'd*

tial body of data on the toxicity and persistence of pollutants, the identity of the dischargers thereof, and the feasibility of effective control. *In fact, little of this type of information existed* for more than a few toxic pollutants, given the overall size of the field. Moreover, the task of assembling and evaluating these data, and filling gaps when they were discovered, proved to be far more than a 90 day exercise. *Implementation of the Federal Water Pollution Control Act (Regulation and Monitoring of Toxic and Hazardous Chemicals): Hearings Before the Subcomm. on Investigations and Review of the House Comm. on Public Works and Transportation* (hereafter, *Toxic Chemical Hearings*), 95th Cong., 1st Sess. 406 (1977) (statement of Thomas Jorling, EPA Asst. Administrator for Water and Hazardous Substances) (emphasis added).

18. Representative Roberts, one of the managers of the Clean Water Act of 1977, explained that congressional oversight had resulted in two key insights: Regulation had been a failure, and procedure was to blame.

The principal regulatory mechanism for the control of toxics in Public Law 92 500 as *originally enacted was contained in section 307(a)*, which set forth the requirement for toxic effluent standards to be issued for toxic pollutants identified by the Administrator. Frankly, it has failed.

Procedural requirements have proven insurmountable for the Agency, to the point where only six toxic chemicals—aldrin/dieldrin, endrin, DDT, toxaphene, benzidine and PCBs—have been regulated. Six chemicals in 5 years.

The Agency's problems have included uncertainty with respect to the intended breadth of the regulatory effort, lack of toxicological and biological data for many chemicals, and scientific disputes over what amount of a "toxic" pollutant . . . can be considered as "safe." But far and away the most severe single problem has been the formal, cumbersome rulemaking process.
123 Cong.Rec. H12927 (daily ed. Dec. 15, 1977).

19. As EPA stated, *Toxic Chemicals Hearings*, at 406:

During these hearings, industry objectors introduced evidence which raised problems in the following areas: analytical and monitoring technology, hydrological assumptions contained in the proposed standards (which varied depending on the character and flow rate of the receiving waters), availability of control technology, impact of proposed standards on important segments of the nation's economy, and identity of point source discharges.
As discussed in this opinion and in *Hercules, Inc. v. EPA*, 194 U.S.App.D.C. at , 598 F.2d at 111, decided today, many of these concerns are irrelevant to section 307(a) standards.

20. The most serious industry concern was what became known as the "pollutant of the month" problem. Industry representatives explained that setting of standards on a pollutant-by-pollutant basis, with new standards coming out at intervals over the years, would interfere with efforts by industry to comply with the standards. In building pollution control facilities to meet the standards for the first pollutants, industry would not be able to predict what would be needed to meet standards for later pollutants. In contrast, even a stringent industry-by-industry approach that would specify all standards for particular types of factories in one package appeared preferable because a company would know what it must do before it began investing in, and building, pollution control facilities. As a result, EPA shifted to a largely industry-by-industry approach under the consent decree entered in 1976, *see* note 22 *infra*, and Congress amended section 307(a) in 1977 to authorize an industry-by-industry approach. *See generally* 33 U.S.C.A. § 1317(a) (1977); Hall, *The Evolution and Implementation of EPA's Program to Control the Discharge of Toxic Pollutants to the Nation's Waters*, 10 Nat.Res.Law. 507, 516 (1977).

21. One suit aimed to expand the list of toxic substances. *See NRDC v. Train*, 171 U.S.App.D.C. 151, 152 53, 519 F.2d 287, 288–89 (1975), *reversing* 6 ERC (BNA) 1702 (D.D.C.1974). Three others were aimed at the failure to promulgate regulations. *See Hall, supra* note 20, 10 Nat.Res.Law at 515.

*in part on other grounds sub nom. NRDC v. Costle*, 183 U.S.App.D.C. 11, 561 F.2d 904 (1977). EPA's new approach had two elements. First, EPA committed itself to controlling toxic substances under provisions of the 1972 Act other than section 307(a), chiefly sections 301 and 304, 33 U.S.C. §§ 1311 & 1314 (1976), which allowed EPA to regulate on an industry-by-industry basis using informal rulemaking proceedings and feasibility criteria. Second, EPA committed itself to make at least limited use of section 307(a): it would regulate some substances, including PCBs, under the provision; and it would use the provision to limit or prohibit discharges of hazardous substances for some or all industrial categories as a supplement to its industry-by-industry approach.[22]

Following the failure in 1974 of its initial regulatory efforts, and consistent with the regulatory program and consent decree eventually adopted, EPA set out in 1975 to investigate PCBs more thoroughly. It commissioned a survey of the scientific literature on PCBs, and sponsored a national conference on PCBs in November 1975.[23] It engaged Dr. Ian Nisbet, an expert in toxicity of PCBs, to prepare a Criteria Document.[24] The Criteria Document served to collect and focus past research on more chlorinated PCBs, but as we will discuss, it contained substantially less material on less chlorinated PCBs.

Based on these preparations, EPA proposed effluent standards for PCBs discharges on July 14, 1976. The proposed standards allowed on the average no more than one part per billion of PCBs in certain discharges by manufacturers of electrical equipment, and prohibited any PCBs in other discharges by manufacturers of electrical equipment and in all discharges by manufacturers of PCBs. The proposed regulations made no distinction between more chlorinated PCBs and less chlorinated PCBs. *See* 41 Fed.Reg. 30476–77 (1976).

On August 20, EPA commenced a formal rulemaking hearing before an administrative law judge on the proposed PCBs standards, which was concluded on November 30 after twenty-one days of testimony. In addition to the Criteria Document, EPA presented testimony of twenty-two witnesses. *See* 42 Fed.Reg. 6532. The PCB Ad Hoc Committee of the Electronics Industry Association, consisting of nine manufacturers of capacitors, proposed more relaxed standards of 100 parts per billion for discharges of one type of less chlorinated PCBs, Aroclor 1016, and Westinghouse Electric Corp. proposed a standard of 50 parts per billion for discharges of another, Aroclor 1242. These parties (hereafter, industry petitioners) presented the testimony of seven witnesses. *See id.* at 6532, 6541. The Environmental Defense Fund (EDF) presented the testimony of one witness concerning carcinogenic effects of PCBs. Three other parties participated in the hearing, and thirteen persons or entities filed written comments. At the close of the hearing, the record was furnished to the EPA Administrator (Administrator) for his consideration.[25]

In January 1977, the Administrator filed his final decision[26] on PCBs standards with the EPA hearing clerk, and, on February 2, 1977, published the standards. 42 Fed.Reg. 6532 (1977). The final standards were more stringent than the proposed standards in that they prohibited any PCBs in discharges of manufacturers of electrical equipment.

22. *NRDC v. Train*, 8 ERC (BNA) 2120, 2122 28 (D.D.C.1976), *rev'd in part on other grounds sub nom. NRDC v. Costle*, 183 U.S.App.D.C. 11, 561 F.2d 904 (1977).

23. *See* text *supra* at of 194 U.S.App.D.C., at 67 of 598 F.2d.

24. This Criteria Document, which is reproduced in full in App. II, resembled the Development Documents EPA uses as the basis of its technology-based water pollution regulations.

*See generally Weyerhaeuser Corp. v. Costle* (D.C. Cir. 1978), 191 U.S.App.D.C. 309, 590 F.2d 1011.

25. The administrative law judge's function in this proceeding consisted of compiling a complete record for the EPA Administrator (Administrator), without making an initial decision or recommendation. *See* 42 Fed.Reg. 6532.

26. There was no tentative decision. *See id.*

On January 19, 1977, EDF petitioned this court for review of the regulations. On January 20, industry petitioners petitioned the United States Court of Appeals for the Third Circuit, and, on April 15, the Bass Anglers Sportsman Society of America petitioned the United States Court of Appeals for the Fifth Circuit. The petitions in the Third and Fifth Circuits were transferred to this court, and the cases were consolidated. A motion by industry petitioners for a stay of the regulations was denied by this court. On December 27, 1977, during the pendency of this appeal, Congress enacted the Clean Water Act of 1977, Pub.L.No.95 217, 91 Stat. 1566, which amended the 1972 Act. Compliance with the PCBs regulations was required by February 2, 1978. 42 Fed.Reg. 6555.

## II. STATUTORY FRAMEWORK.

The earliest version of the Federal Water Pollution Control Act was passed in 1948, and it was amended five times prior to 1972. *See* W. Rodgers, *Environmental Law* 355 61 (1977). Congress overhauled it completely in the Federal Water Pollution Control Act Amendments of 1972. This "statute, enacted on October 18, 1972, authorized a series of steps to be taken to achieve the goal of eliminating all discharges of pollutants into the Nation's waters by 1985, § 101(a)(1)." *E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 116, 97 S.Ct. 965, 969, 51 L.Ed.2d 204 (1977). The steps to be

taken included promulgation by EPA of effluent standards, or regulations limiting discharges of various kinds of pollutants, under a number of statutory provisions covering industrial sources, municipal sources, sources that discharge into public treatment facilities (pretreatment standards), and sources that discharge toxic pollutants. *See* W. Rodgers, *supra*, at 451-88.

The Supreme Court and this court have previously reviewed industrial source effluent regulations.[27] However, no court has previously reviewed toxic pollutant effluent regulations adopted pursuant to section 307(a). The toxics standards provision of the 1972 Act, section 307(a), poses a number of difficult interpretive problems. Fortunately, we have some aids in interpreting this section, including both a prior and a subsequent legislative enactment. Prior to the 1972 Act, Congress passed the Clean Air Act Amendments of 1970, containing a hazardous air pollutant provision[28] that bears a marked resemblance to the toxics provision. Subsequent to the 1972 Act, Congress amended the toxics provision in the Clean Water Act of 1977. *See* 33 U.S.C.A. § 1317(a) (1977). Following the example of the Supreme Court in *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978),[29] we employ the subsequent amendment as an aid in interpreting the 1972 provision under which the standards under review were promulgated.

---

**27.** *See, e. g., E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *Weyerhaeuser Co. v. Costle, supra* note 24; *American Paper Inst. v. Train*, 177 U.S.App.D.C. 181, 543 F.2d 328, *cert. dismissed*, 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976); *American Frozen Food Inst. v. Train*, 176 U.S.App.D.C. 105, 539 F.2d 107 (1976).

**28.** Section 112 of the Clean Air Act Amendments of 1970, originally codified at 42 U.S.C. § 1857c-7 (1970), now codified as amended at 42 U.S.C.A. § 7412 (1978). Section 307(a) has a number of similarities with section 112 of the Clean Air Act Amendments of 1970. Both provide for publication of a list of substances within ninety days of enactment. *Compare* subsection 307(a)(1) *with* subsection 112(b)(1)(A). Both provide for proposal of standards within

one hundred and eighty days of publication of the list, and promulgation of final standards within a like period (one hundred and eighty days or six months). *Compare* subsection 307(a)(2) *with* subsection 112(b)(1)(B). Both provide that standards shall be set at a level which provides "an ample margin of safety." *Compare* subsection 307(a)(4) *with* subsection 112(b)(1)(B).

**29.** The Court determined that criminal sanctions were unavailable for the enforcement of a rule prescribing the manner of demolishing buildings containing asbestos. The rule and the case arose under the 1970 version of the hazardous air pollutant provision, but the Court employed the 1977 amendment of the provision as an aid in interpreting the original version. 98 S.Ct. at 573 & n.4, 575.

Prior to 1972, there was no special provision in the federal water pollution laws to cope with toxic pollutants. As the number and amount of chemicals discharged into the nation's waterways increased in recent decades, it became apparent that some groups of chemicals posed a special danger to public health and the environment. There were two leading examples of such groups: chlorinated hydrocarbons, a group that included both pesticides (such as DDT, endrin, and toxaphene) and industrial chemicals (such as PCBs); and heavy metals, a group that included cadmium, mercury, and others.[30]

Toxic substances, such as these, create a special danger in several ways. As demonstrated by a number of disasters involving widespread human poisoning or massive kills or contamination of fish, shellfish, birds, and other wildlife, many chemicals discharged into waters are lethal or injurious even in minute doses.[31] Toxic chemicals have been identified repeatedly as a cause of cancer, through studies both of persons exposed to such chemicals on the job and elsewhere, and of animals in the laboratory and the field.[32] Moreover, toxic substances often have characteristics besides toxicity that magnify their danger. These characteristics include (1) physical and chemical factors such as resistance to detoxification by sunlight and water, and mobility in the air and water; and (2) biological factors, such as tendencies not to be safely degraded by organisms, but rather to accumulate in organisms or to degrade into other toxic substances. Finally a most troubling characteristic of toxic substances is how little

---

**30.** "Arsenic, cadmium, mercury, and beryllium as well as certain chlorinated hydrocarbons, have been identified as pollutants which could be subject to effluent standards or prohibitions that would be established under this [toxics] section." 2 Senate Comm. on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972 (hereafter, Legislative History) at 1478 (Comm. Print 1973) (Senate Report).

The legislative history further elaborates:

The following substances were mentioned in relation to potential toxic effects by the President's Council of Environmental Quality (April, 1971) in a report entitled *Toxic Substances*: lead, cadmium, mercury, vanacium, arsenic, molybdenum, antimony, nickel, barium, beryllium, copper, selenium, zinc, nitrilotriacetic acid (NTA), orthonitrochlorobenzene (ONCB), polychlorinated biphenyls (PCB's), dichlordiphenyltrichloroethane (DDT). The Committee expects the Administrator to give first consideration to these pollutants in the exercise of his authority under Section 307.

*Id.* at 1495–96 (Senate Report) (discussion of definition of toxic pollutants).

**31.** Perhaps the most famous and horrifying disaster was the poisoning of hundreds of people in Japan by PCBs in 1968, which figured prominently in debate over the adequacy of environmental legislation and regulation. *See* Star, note 11 *supra* 1 Harv.E.L.Rev. at 561-62.

**32.** One of the most influential publications in the eventual enactment of the 1972 Act was R. Carson, Silent Spring (1962), which devoted considerable attention to the carcinogenic nature of some heavy metals and some chlorinated hydrocarbon pesticides. *See* chapter 14, "One in Every Four," at 219–43. The book quoted Dr. Malcolm Hargraves of the Mayo Clinic about the cancer danger:

Environmental diseases related to the use of various toxic substances have been increasing, "particularly during the past ten years," Dr. Hargraves believes. From extensive clinical experience he believes that "the vast majority of patients suffering from the blood dyscrasias and lymphoid diseases have a significant history of exposure to the various hydrocarbons which in turn includes most of the pesticides of today. A careful medical history will almost invariably establish such a relationship." This specialist now has a large number of detailed case histories based on every patient he has seen with leukemias, aplastic anemias, Hodgkin's disease, and other disorders of the blood and blood-forming tissues. "They had all been exposed to these environmental agents, with a fair amount of exposure," he reports.

*Id.* at 227. A number of the points in the book formed the basis for legislation and regulation. For example, the book noted the increasing concern about contamination of public water supplies by carcinogens and co-carcinogens. *See id.* at 238 39. In 1974, "Congress passed the Safe Drinking Water Act in response to increasing indications of a serious threat to health from contaminants in our drinking water not related to communicable disease. . . . There is ample evidence establishing the fact that our drinking water is contaminated with a large variety of organic substances, of demonstrated carcinogenicity in animals." *EDF v. Costle [Safe Drinking Water]*, 188 U.S.App. D.C. 95 at 101, 103, 578 F.2d 337 at 343, 345 (1978).

they are understood by scientists. New discoveries about their nature and effects are made constantly, but existing knowledge seems inadequate to measure their full danger.[33]

Congress's response to the toxics problem was section 307 of the 1972 Act. Other interlocking sections gave prominence to section 307. Section 101(a)(3) of the Act, 33 U.S.C. § 1251(a)(3) (1976), stated that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." Section 502(13), 33 U.S.C. § 1362(13) (1976), gave a broad definition[34] to "toxic pollutant," drawing on the wide array of direct and indirect effects of such substances. Other provisions established that citizen suits for violations of section 307 were free from certain procedural requirements of other citizen suits,[35] that section 307 standards were to become effective quickly,[36] and that section 307 standards were to be reviewed at least every three years.[37] The 1977 amendments to the Act continued this highlighting tendency, by declaring that toxic pollutant standards are not subject to individual waiver or modification as are other standards.[38]

Section 307(a) sets forth the substantive considerations and procedures for EPA to use in formulating toxics standards. In the substantive provisions, section 307(a)(2) requires EPA to "take into account" six factors that were intended to cover comprehensively the effects of toxic substances in the environment. Section 307(a)(5) allows EPA to set different standards for industrial categories using different processes. Section 307(a)(4) directs EPA to set the standards at a level that provides "an ample margin of safety," a phrase that is the section's polestar—its guiding principle in protecting against incompletely understood dangers.

More complex than the section's substantive provisions are its procedural provisions,

33. The role of accounts of unexpected dangers, which highlighted the scientific uncertainties about toxic substances, in the passage of the Toxic Substances Control Act was described by Reynolds, *The Toxic Substances Control Act of 1976: An Introductory Background and Analysis*, 4 Colum.J.Env.L. 35, 54-55 n.67 (1977):

> Throughout the 94th Congress, accounts of chemical dangers were drawn from newspapers around the nation and introduced into the Congressional Record in support of the Act. As much as any direct lobbying activity, such reports argued persuasively in favor of stringent regulation and gave credence to the contentions of consumer and environmental advocates. *See* 122 *Cong.Rec.* H1206–08 (daily ed. Feb. 19, 1976), E1449-50 (daily ed. Mar. 22, 1976), S4005-07, E1487-89 (daily ed. Mar. 23, 1976), S4142 (daily ed. Mar. 24, 1976), S4239–40, E1544-45, E1554-56 (daily ed. Mar. 25, 1976), E1649-51, E1676–78 (daily ed. Mar. 30, 1976), E1710-11, E1714–16 (daily ed. Mar. 31, 1976), E1725–26 (daily ed. Apr. 1, 1976), E1847-48 (daily ed. Apr. 6, 1976), E1879 (daily ed. Apr. 7, 1976), E1942 (daily ed. Apr. 9, 1976), E2016–18 (daily ed. Apr. 13, 1976), S10145-46 (daily ed. June 22, 1976), S13666–67 (daily ed. Aug. 5, 1976).

34. Section 502(13), 33 U.S.C. § 1362(13) (1976) provides:

> The term "toxic pollutant" means those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator, cause death, disease, behavorial abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring.

The legislative history discusses the function of the definitional section:

> A definition of toxic substance is provided to assist the Administrator in implementing his authority under section 307 to regulate toxic discharges. The definition provides a benchmark for evaluating those pollutants which in certain concentrations would have a particularly adverse impact on humans as well as other forms of life.

Legislative History at 1495 (Senate Report).

35. Section 505(b)(2), 33 U.S.C. § 1365(b)(2) (1976).

36. Section 307(a)(6) provides that toxics regulations must become effective within one year of their promulgation. Further, section 402(k) of the Act, 33 U.S.C. § 1342(k) (1976), imports that compliance with a standard imposed under section 307(a) for a toxic pollutant "injurious to human health" is required prior to expiration of an existing permit.

37. Section 307(a)(3).

38. *See* 33 U.S.C.A. § 1311(g)(1) & (*l*) (1977).

which mingle formal with informal rule-making. As discussed previously, the statute prescribed mandatory deadlines for listing of toxic substances, proposal of standards, and promulgation of standards. The basic mechanism was informal rulemaking. However, following the arrangement of section 112 of the Clean Air Act, see note 28 supra, Congress grafted an added procedural limb to the body of the provision. A hearing was to be held, and a finding concerning whether a modification of a proposed effluent standard was justified was to be made "on the record" of that hearing.[39]

In the Clean Water Act of 1977, Congress amended the toxics provision in major part to solve the problems revealed in the course of the 1973-76 proceedings. Congress adopted its own list of sixty-five families of toxic substances in place of EPA's older, shorter lists,[40] and created two procedures for EPA to use, separately or in tandem. Under the first procedure, amended section 307(a)(2), 33 U.S.C.A. § 1317(a)(2) (1977), directed EPA· to set industry-by-industry regulations based on technological feasibility criteria.[41] Under the second procedure, which was based on the 1972 provision, amended section 307(a)(2) directed EPA to set health-based effluent standards on a pollutant-by-pollutant basis using the origi-nal factors of toxicity, persistence, degradability etc., and the familiar "ample margin of safety" standard.[42] The original cumbersome procedures were relaxed: formal procedures were replaced by informal ones, and the timetable for rulemaking was enlarged.[43]

III. PROCEDURAL CHALLENGES.

■ Industry petitioners raise two challenges to the PCBs regulations on procedural grounds. First, they contend that the EPA judicial officers assisting the Administrator in preparing the decision improperly relied on the EPA staff members who were advocates for the regulations. This contention is based on both the fact of contacts between staff advocates and judicial officers,[44] and the close similarity between the findings and conclusions proposed by the staff advocates and the final decision.[45] This contention is identical to one raised in Hercules, Inc. v. EPA, (1978), 194 U.S.App. D.C. · at ··, 598 F.2d 91 at 119 128, decided today; and we reject it for the reasons stated therein.

Second, petitioners contend that EPA's assignment of a staff attorney to act as a special judicial officer in this proceeding was improper. Industry petitioners' challenge to this assignment is the only procedural contention in this case not paralleled

39. Section 307(a)(2) & (3); see Hercules, Inc. v. EPA, 194 U.S.App.D.C. at , 598 F.2d at 117.

40. 33 U.S.C.A. § 1317(a)(1) (1977). The list of sixty-five families of toxic substances, which includes PCBs, is published at 43 Fed.Reg. 4108 (1978).

41. The industry-by-industry procedure uses "best available technology economically achievable" as a floor for regulatory standards. For the genesis of this approach, see note 20 supra.

42. One new factor was added to those in the original section 307(a)(2): "the extent to which effective control is being or may be achieved under other regulatory authority." 33 U.S.C.A. § 1317(a)(2) (1977).

43. See 33 U.S.C.A. § 1317(a) (1977). In place of procedures "on the record," EPA was directed to provide a public hearing at which there would be an opportunity for oral and written presentations by the public, as well as cross-examination if EPA deemed it appropriate. The apparent reasons for abandoning procedures "on the record" were twofold: to remove a major cause of EPA's previous problems in promulgating health-based effluent standards, and to allow EPA to use compatible informal procedures under the industry-by-industry and pollutant-by-pollutant approaches, so that, in a single proceeding, EPA could set standards for a pollutant for some industrial categories using the former approach, and standards (or prohibitions) for other categories using the latter approach.

44. These contacts were for the sole purpose of locating documents in the administrative record. See Response of EPA to Court's Order of April 25, 1978, May 10, 1978, at 3.

45. See Supplemental Memorandum of Industry Petitioners, May 25, 1978, at 3.

in *Hercules,* and so we address it in somewhat more detail than the first contention. In the PCBs proceeding, EPA assigned Mr. John Settle, an attorney in the Grants, Contracts and Administration Division of EPA's Office of General Counsel,[46] to act as a special judicial officer and, in that role, to assist the agency's chief judicial officer in preparing the final decision under the Administrator's supervision.

■ Under section 5(d)(2) of the Administrative Procedure Act (APA), 5 U.S.C. § 554(d)(2) (1976), in agency adjudication, an agency employee who makes an initial or recommended decision may not "be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency."[47] EPA staff who advocated the proposed rules before the agency are also employees of a Division in the Office of the General Counsel.[48] By analogy to section 5(d) of the APA, which applies only to adjudication, industry petitioners allege that Mr. Settle's assistance in preparing the Administrator's final decision requires that the regulations be vacated and remanded.[49] We disagree.

The proceedings in this case were clearly rulemaking proceedings. *See Hercules, Inc. v. EPA,* 194 U.S.App.D.C. at — – —, 598 F.2d at 117–119. Congress was of the view that the APA's separation of functions provision, section 5(d), should not apply to rulemaking proceedings, and its failure to make the provision applicable to rulemaking was intentional.[50] In Congress's view, the need for flexibility in rulemaking outweighed the advantages of rigid staff divisions.

There is no contention that Mr. Settle was involved in any way in the rulemaking proceedings in question prior to his assignment to assist the Administrator.[51] Moreover, there is no contention that anyone in the Office of General Counsel placed im-

---

**46.** *See id.* at 1, 3–5.

**47.** *5 U.S.C. § 554(d) (1976) provides as follows:*
The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—
(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or
(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.
An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—
(A) in determining applications for initial licenses;
(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) to the agency or a member or members of the body comprising the agency.
*EPA contends that even if section 5(d) of the Administrative Procedure Act, 5 U.S.C. § 554(d) (1976), applied to this rulemaking proceeding, it would not prevent Mr. Settle's participation as a special or acting judicial officer, because Mr. Settle played no role in the instant proceedings and was employed by a branch of the General Counsel's office that had no responsibilities for any investigative or prosecuting functions in the proceedings. Because of our disposition of the case, we have no occasion to reach this issue.*

**48.** *See* Response of EPA to Court's Order of April 25, 1978, May 10, 1978, at 3.

**49.** Supplemental Memorandum of Industry Petitioners, May 25, 1978, at 4–5.

**50.** *See* S.Rep.No.752, 79th Cong., 1st Sess. 203–04 (1945); 92 Cong.Rec. 5651 (1946) (remarks of Rep. Walter). *See generally Withrow v. Larkin,* 421 U.S. 35, 46–58, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *International Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Electrical Workers,* 419 U.S. 428, 448 & n.18, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975); *Au Yi Lau v. INS,* 181 U.S.App.D.C. 99, 106, 555 F.2d 1036, 1043 (1977).

**51.** *See* note 48 *supra.*

proper pressure upon him in his capacity as acting judicial officer.[52]

Industry petitioners contend "there is an obvious risk that an individual placed in this position might be easily swayed, consciously or subconsciously, by the possibility that a decision adverse to his superior would adversely affect his career prospects."[53] However, to the extent that there may be such a risk, or an appearance of such a risk, Congress found that the benefits of protecting against it outweighed the countervailing inefficiency created by rigid staff division only in adjudicatory proceedings, not rulemaking. In the absence of any contention by petitioners that Mr. Settle was improperly influenced, we reject their allegation that his participation in the preparation of the final decision tainted the regulations.

## IV. INTERACTION WITH TOXIC SUBSTANCES CONTROL ACT.

Congress enacted the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 2629 (1976), during the pendency of EPA's proceedings on the proposed PCBs effluent standards. TSCA requires notice of intent to manufacture, and pre-manufacture testing of chemical substances, and confers authority on EPA to regulate the manufacture, processing, distribution in commerce, use, or disposal of such substances. In addition to the provisions applicable to chemical substances in general, TSCA includes a specific provision concerned solely with poly-chlorinated biphenyls, section 6(e), 15 U.S.C. § 2605(e) (1976). Section 6(e) provides for a gradual phasing out of PCBs use over a two and one-half year period with limited provision for exemptions.[54]

Industry petitioners contend that this section of TSCA was intended to "preempt" EPA's authority under the 1972 Act. They assert that EPA's ban on discharges of PCBs into waterways makes manufacture and processing of PCBs impossible and that TSCA's phase-out timetable and exemption authority show that Congress did not intend PCBs to be completely and immediately phased out. Therefore, the argument goes, EPA should not achieve this result by the use of its authority under another regulatory provision, the toxics section of the 1972 Act. EPA responds that Congress did not intend section 6(e) to deprive it of its authority under the 1972 Act.[55]

■ We agree with EPA. Strictly speaking, the claim made by industry petitioners is one of "repeal by implication," the overriding of one statute by a later enactment *sub silentio*, rather than a claim of "preemption." "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168 69, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976) (collecting cases). "Implied repeals occur if two Acts are *in irreconcilable conflict.*" *Runyon v. McCrary*, 427 U.S. 160, 172–73 n.10, 96 S.Ct. 2586, 2595, 49 L.Ed.2d 415 (1976) (emphasis

---

52. *See* note 49 *supra*.

53. Supplemental Memorandum of Industry Petitioners, May 25, 1978, at 4.

54. One year after the effective date (January 1, 1977), PCBs manufacture, processing, distribution in commerce or use is forbidden "other than in a totally enclosed manner." Section 6(e)(2)(A), 15 U.S.C. § 2605(e)(2)(A) (1976). One year thereafter, "no person may manufacture any polychlorinated biphenyl"; six months beyond that, "no person may process or distribute in commerce any polychlorinated biphenyl." Section 6(e)(3)(A), 15 U.S.C. § 2605(e)(3)(A) (1976). This phase-out is limited by the EPA Administrator's discretionary authority to grant temporary conditional exemptions for petitioners who qualify to his sat-isfaction under two tests. Section 6(e)(3)(B), 15 U.S.C. § 2605(e)(3)(B) (1976). "That this subsection was added to both Senate and House versions of the Act by floor amendment despite opposition to singling out one substance to the exclusion of others, is a reflection of the extremely hazardous nature of PCB's." Reynolds, *supra* note 33, 4 Colum.J.Env.L. 35, 78 (1977) (footnote omitted); *see* note 10 *supra*.

55. EPA also contends that its ban on discharges would still allow manufacture and use of PCBs if industry were to take proper steps to prevent PCBs discharges. Brief for Respondent at 24. We do not find it necessary to reach this question.

added). When confronted with statutes that are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133–34, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) (quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)).

Not only is there no "clearly expressed congressional intention" that TSCA repeal EPA's prior regulatory authority, and no "irreconcilable conflict" between TSCA and the 1972 Act, but, in fact, Congress carefully and explicitly harmonized TSCA with prior enactments. Section 9(b) of TSCA, 15 U.S.C. § 2608(b) (1976) (emphasis added), provides, in part:

> If the Administrator determines that a risk to health or the environment associated with a chemical substance or mixture *could be eliminated or reduced* to a sufficient extent *by actions taken under* the. authorities contained in . . . *other Federal laws, the Administrator shall use such authorities* to protect against such risk unless the Administrator determines, in the Administrator's discretion, that it is in the public interest to protect against such risk by actions taken under this chapter. This subsection shall not be construed to relieve the Administrator of any requirement imposed on the Administrator by such other Federal laws.

Section 9(b) leaves EPA the choice of regulating toxic substances under TSCA, other statutes (such as the 1972 Act), or both. Throughout debate over passage of TSCA, representatives of the chemical industry urged that it would be unnecessarily duplicative of existing authority, and that EPA should not be given a choice among multiple regulatory authorities.[56] Congress rejected those arguments, which petitioners, in effect, now seek to resurrect. Congress determined that a choice among regulatory authorities was necessary so that EPA could use the most effective means available to combat unknown and potentially extreme risks from toxic substances, and that judicial review of EPA's choice was inappropriate.[57] Our interpretation of section 9(b) is reinforced by section 6(e)(5), 15 U.S.C. § 2605(e)(5) (1976), which states: "[t]his subsection [6(e) (governing PCBs)] does not limit the authority of the Administrator, under any other provision of this chapter or any other Federal law, to take action respecting any polychlorinated biphenyl."

Petitioners contend it is incongruous that EPA can take action concerning PCBs under section 307 that they contend, Congress did not subsequently authorize under TSCA.[58] However, the provision of multi-

---

**56.** The industry position on this point is discussed in detail in Reynolds, *supra* note 33, 4 Colum.J.Env.L. at 52 -53.

**57.** The legislative history on this point is absolutely clear. *See* H.R.Rep.No.1679, 94th Cong., 2d Sess. 85 (1976) (Conference Report 3):

While it is clear that the Administrator's determination that it is in the public interest to use this Act, is a completely discretionary decision not subject to judicial review in any manner, it is expected that the Administrator will review the other authorities and present the results of that review at the same time the Administrator takes action under this Act. While the Administrator's decision to use this Act, notwithstanding the other authorities, is unreviewable by any court, a reviewing court is expected to require that the Administrator have examined the other authorities and present the results of that examination when making the finding that it is in the public interest to use this Act . . . .

This provision is not to be construed to relieve the Administrator of any requirement imposed by other Federal laws upon the Administrator, and of course nothing in this Act shall affect any final action taken under other Federal laws administered by the Administrator or in any way affect the extent to which health or the environment is to be protected under such other Federal laws.

**58.** Industry petitioners cite *Araya v. McLelland*, 525 F.2d 1194, 1196 (5th Cir. 1976) and *International Union of Elec. Radio and Mach. Workers v. NLRB*, 110 U.S.App.D.C. 91, 95, 289 F.2d 757, 761 (1960). However, these cases concern acts providing for inconsistent procedures in circumstances in which one act's procedure could not be followed without the other act's procedure being transgressed.

ple regulatory authorities is far from unknown. Indeed, the Supreme Court recently noted, concerning civil rights legislation, that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). Legislative enactments concerning dangerous substances evince a similar intent. In *EDF v. Department of Health, Education and Welfare*, 138 U.S.App.D.C. 381, 428 F.2d 1083 (1970), this court held that Congress had not intended, by passage of the Federal Insecticide, Fungicide and Rodenticide Act, to limit authority to regulate pesticide residues in food under the Federal Food, Drug and Cosmetic Act. *Id.* 138 U.S.App.D.C. 384 86, 428 F.2d at 1086-88. Similarly, in *Bell v. Goddard*, 366 F.2d 177 (7th Cir. 1966), the court held that Congress had not intended by passage of the Poultry Products Inspection Act, to limit authority to regulate drug residues in poultry under the Federal Food, Drug and Cosmetic Act. Accordingly, we find no merit in the argument that TSCA was intended to constrain EPA's authority under the 1972 Act.

## V. EVIDENTIARY BASIS FOR REGULATION OF LESS CHLORINATED PCBs.

### A. *Arguments of the Parties.*

The principal claim of industry petitioners is that EPA's regulations lack an adequate basis in the record to the extent that they cover less chlorinated PCBs because the record consists, in large part, of studies of related, but different substances (more chlorinated PCBs). In order to rule on this claim, we have no alternative except to venture into a difficult realm of chemistry and toxicology, for, however deferential may be our review, we cannot rule on an issue without a firm grasp of it.[59]

PCBs are a group of related chemicals that have two aspects in common. First, they share a basic chemical structure known as the "biphenyl" structure, consisting of two rings of carbon atoms with hydrogen atoms attached.[60] Second, instead of a simple biphenyl structure PCBs have one or more chlorine atoms substituting for one or more hydrogen atoms. From these two aspects comes the name "polychlorinated biphenyls." PCBs vary with respect to how much chlorine is substituted for hydrogen, ranging from one to ten chlorine atoms per molecule of PCBs.[61]

Commercially, PCBs are manufactured and sold in the form of mixtures. Some mixtures contain predominantly PCBs with few chlorine atoms per molecule; these are termed "less chlorinated PCBs."[62] Other PCBs mixtures contain predominantly PCBs with more chlorine atoms per molecule; these are termed "more chlorinated PCBs."[63]

As we have discussed, more chlorinated PCBs were the main PCBs in use from 1929

---

59. We are not the first to venture onto this ground. A full treatment of the chemistry of PCBs can be found in *General Electric Co.*, 6 Envir.L.Rep. (Envir.Law Inst.) at 30008-09.

60. The biphenyl structure consists of a framework of twelve carbon atoms arranged in two rings of six carbons each. The two rings are joined together by a bond, not unlike two hexagonal eyeglass lenses joined by a nose piece. Each ring has the chemical structure of benzene, with the special resonating bonds that create an extremely stable chemical structure. It is this stability that gives PCBs both their electrical and nonflammable properties, and their hazardous environmental qualities, since organisms cannot easily degrade the biphenyl structure. App. II 4 5.

61. If only a single chlorine atom has been substituted, the PCB is monochlorobiphenyl. If

two have been substituted, the PCB is bichlorobiphenyl, and so on, up through and beyond tri-, tetra-, penta-, and hexachlorobiphenyl with its six chlorine atoms. The general term "polychlorinated biphenyl" is used to cover them all. *Id.*

62. The leading commercial mixture of less chlorinated PCBs, Aroclor 1016, has fifty-seven percent trichlorobiphenyl, and lesser percentages of bi- and tetrachlorobiphenyl, with traces of mono- and pentachlorobiphenyl. *Id.* at 11.

63. Aroclor 1248, for example, has fifty percent tetrachlorobiphenyl with substantial percentages of penta- and trichlorobiphenyl, as well as traces of hexa-, mono-, and bichlorobiphenyl. *Id.*

until the early 1970's.[64] In the early 1970's, under public and government pressure, PCBs manufacturers and users shifted from more chlorinated to less chlorinated PCBs.[65] The chemical and electrical industries were able to shift relatively rapidly from use of one PCBs mixture to another. However, this shift created the "knowledge gap" that underlies the principal issue in this proceeding. As a practical matter, scientific knowledge about the effects of chemicals cannot keep up with the ability of industrial laboratories to create new ones. Most of the available scientific studies on PCBs concern more chlorinated PCBs, either because the studies were conducted over the decades when more chlorinated PCBs were the main PCBs in use, or because, even after the early 1970's, scientists continued to study the more chlorinated PCBs.[66]

Accordingly, EPA faced a familiar choice in this proceeding. On one hand, it could regulate a substance whose properties were incompletely understood (less chlorinated PCBs) by relying, in major part, upon its knowledge about more familiar substances (more chlorinated PCBs), despite the uncertainties of extrapolation from one substance to another. On the other hand, it could delay regulation until science could more fully explore the risks of the new substance.

Industry petitioners contend that EPA lacked an adequate basis for regulation because of this incompleteness in the scientific knowledge about less chlorinated PCBs mixtures. They argue that EPA "could not have reasonably hoped to regulate Aroclors 1016 and 1242 [less chlorinated PCBs] without commissioning extensive studies on comparative mammalian toxicity. The Agency failed to commission such studies. . . . It is the failure of the Administrator to present studies relating to Aroclors 1016 and 1242 which has led to his attempt to build an elaborate evidentiary house of cards." Brief for Industry Petitioners at 53. Petitioners assert, in effect, that EPA cannot rely upon merely suggestive evidence or upon extrapolation from data concerning related substances to justify regulation of the less chlorinated PCBs. They insist that EPA must trace a line of direct causation from each substance it regulates to the danger requiring regulation.

In response, EPA disputes that it must produce such direct proof concerning the danger posed by every regulated substance. EPA notes that the statutory standard calls for setting discharge levels at the level that will provide "an ample margin of safety," and cites prior authority, particularly *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1 (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), to support its position. In EPA's view, action need not be delayed while a risky situation persists—that is, until the extent of the danger is fully ascertained. EPA contends that ample evidence showing the danger of more chlorinated PCBs together with scientific reasoning and evidence that less chlorinated PCBs share some dangerous qualities of more chlorinated PCBs, constitutes an adequate basis for regulation.

### B. *Applicable Legal Standards.*

Section 307(a)(2) sets forth the relevant factors for setting toxic effluent standards.

---

**64.** *See* text accompanying note 4 *supra.*

**65.** "Until 1971, Monsanto sold large quantities of various Aroclors, especially 1242, 1254 and 1260 [the latter two being more chlorinated types]. In 1971, the company introduced a new mixture, which it designated Aroclor 1016 ("A-1016"). Since then, A 1016 has accounted for an increasing proportion of PCB sales, until in 1975, A-1016 sales are running at a greater rate than the sales of all other Aroclors combined." *General Electric Co.*, 6 Envir.L. Rep. (Envir.Law Inst.) at 30009.

**66.** There is not infrequently a lag in scientific attention to new substances, for a number of reasons: researchers are not fully aware of the industrial news (often a trade secret at first); previous research has developed a base of knowledge and theory that must be abandoned when research shifts to new substances; and it is more convenient for researchers to continue working with older substances for which the methodology (such as the best animals for testing and the proper dosages) has already been worked out, than to switch to working with new substances. This lag is one of the principal reasons for the Toxic Substances Control Act, which requires manufacturers, in appropriate circumstances, to engage in premarketing testing, so that the lag is "filled in" by compulsory early testing.

It requires EPA to "take into account" six factors in proposing such standards: "the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms."

The six factors consist of two groups. The first three factors, toxicity, persistence, and degradability, constitute a carefully drafted tripartite division of the relationship between a toxic substance and the environment. Toxicity concerns the adverse biological effects of toxic substances on life in the environment.[67] Persistence concerns the physical and chemical effects of the nonliving environment (such as sunlight and water) on toxic substances.[68] Degradability concerns the effects of the living environment on toxic substances.[69] Taken together, the three factors were intended to cover comprehensively the fate of toxic substances in the environment and their effects on living organisms.[70]

The last three factors concern "affected organisms" : their presence (usual or potential) "in any waters," their importance, and the effect on them of the toxic substance. Inclusion of these factors requires EPA to focus on specific effects on specific important organisms as well as on the general toxicity, persistence, and degradability of the substance. On the list of "affected organisms" is, of course, man,[71] although other organisms may certainly trigger the last three factors.

Based on these factors, section 307(a)(4) directs EPA to set discharge standards at a level providing an "ample margin of safety." The parties dispute the significance of this important subsection. EPA argues that this subsection gives it latitude to protect against risks that are incompletely understood, in essence to "err" on the side of "overprotection" with respect to known risks in order to provide safety from unknown dangers. Industry petitioners disagree.

■ On examination of the wording of the statute and the legislative background, we find ourselves in agreement with EPA, whose interpretation of the complex statutes it administers is, of course, entitled to some deference. *E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 134–35, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *Union Electric Co. v. EPA*, 427 U.S. 246, 256, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); *Train v. NRDC*, 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Despite the problems associated with estimating the scale of incompletely understood dangers, Congress required EPA to set standards that would protect against them.

The "ample margin of safety" standard was taken originally from technical jargon

67. Under the rubric of toxicity, EPA takes into account lethal effects, sublethal injurious effects, carcinogenicity, mutagenicity, synergistic effects with other substances, and similar matters. *See* 42 Fed.Reg. 6534 -38.

68. Under the rubric of persistence, EPA takes into account the physical measurements of the size and history of accumulations of substances in the environment, the capacity of air and water to break down, alter, or transport substances, the tendency of substances to adhere to sediments, and similar physical and chemical matters. *See id.* at 6538 -39.

69. In the discussion of degradability, EPA takes into account the ability of organisms to metabolize or eliminate substances, the toxic intermediates produced during metabolism, bioaccumulation and biomagnification, and similar matters concerning the effects of the organisms on the substances, and the effects that the substances have on organisms, in turn, as a result of degradation, bioaccumulation and similar processes. *See id.* at 6539–41.

70. These factors overlap to some extent. EPA has construed them as described, and we concur in that construction, to minimize the overlap, and thus to carry out Congress's aim of comprehensive coverage. *See* note 34 *supra.*

71. Through contamination of drinking water and edible fish, man may be jeopardized by toxic substances in the water. From the definition of "toxic pollutant," it is clear that the phrase "affected organisms" was intended to include all organisms jeopardized by toxic substances in the water, such as man, fish-eating birds, and domestic animals raised on fish diets. *See* note 34 *supra* ; 33 U.S.C. § 1342(k) (1976) (addressing toxic pollutants "hazardous to human health" ).

for use in section 112 of the Clean Air Act Amendments of 1970, the hazardous pollutants provision. *See* note 28 *supra.* One academic commentator has traced the history of the use of this term:

> The term [margin of safety] seems to have been borrowed in the first instance from the field of engineering. It is a common engineering practice to incorporate a factor of safety into the design of a structure to "ensure that under full working loads the stress will nowhere exceed a safe working limit." The safety factor is meant to compensate for uncertainties and variabilities in design, materials workmanship, and so forth; the greater the variability, the larger the factor of safety.

> That the use of the term "margin of safety" in section 307(a) was similarly meant by Congress to take into account and compensate for uncertainties and lack of precise predictions in the area of forecasting the effects of toxic pollutants is confirmed by reference to the Clean Air Act. FWPCA section 307(a) is very similar to section 112 of the Clean Air Act. Among the similarities is the requirement in both that any standard set should provide "an ample margin of safety."

> . . . . .

> Congress . . . provided in section 307(a) of the FWPCA, as in section 112 of the Clean Air Act, that the "margin of safety" be "ample." This is in contrast to the requirement of section 109 of the Clean Air Act that primary air standards assure an "*adequate* margin of safety"; the requirement of the Safe Drinking Water Act that contaminant levels for public water supplies be set at a level to assure "an *adequate* margin of safety"; or the requirement of section 303(d)(1)(C) of the [1972 Act] that waste load allocations be established at simply "a margin of safety."

> "Ample" is defined as "abundant; plentiful; more than adequate." Clearly Congress intended that in dealing with toxic pollutants that pose a threat to human health, margins of safety should be generous to ensure protection of human health and aquatic ecosystems to the greatest extent possible.

Hall, *The Control of Toxic Pollutants Under the Federal Water Pollution Control Act Amendments of 1972*, 63 Iowa L.Rev. 609, 629 30 (1978) (footnotes omitted) (emphasis in original). The foregoing analysis demonstrates that the term "margin of safety" was intended to provide protection "against hazards which research has not yet identified." [72] Moreover, the public and the environment were not to be exposed to anything resembling the maximum risk. Not only was EPA to provide a "margin of safety," but the margin was to be greater than "normal" or "adequate": the margin was to be "ample." If administrative responsibility to protect against unknown dangers presents a difficult task, indeed, a veritable paradox—calling as it does for knowledge of that which is unknown—then, the term "margin of safety" is Congress's directive that means be found to carry out the task and to reconcile the paradox. Addition of a generous measure—"ample"—is Congress's recognition that the EPA would need great latitude in meeting its responsibility.[73]

72. 1 Senate Comm. on Public Works, 93d Cong., 2d Sess., A Legislative History of the Clean Air Act Amendments of 1970, at 410 (Comm.Print 1974) (Senate Report) (describing use of the term in a related section). The legislative history of the definition of toxic pollutant, *see* note 34 *supra*, similarly states that "margins of safety" should be provided "to reflect the lack of data on potential toxicity where there is no experience under conditions of human or environmental exposure." Legislative History at 1496 (Senate Report).

73. The toxics section reflects a policy behind the 1972 Act: a congressional determination that pollution standards must be set to protect against dangers concealed by the limitations of current scientific knowledge. It must be recalled that the Act was preceded by years in which new crises and unsuspected threats to public health and the environment arose with distressing frequency. In response, the 1972 Act "was based in part on the hard-nosed assessment of our scientific ignorance: 'we know so little about the ultimate consequences of

## C. Scope of Review.

█ EPA's decision is reviewed under the "substantial evidence" test. Three leading Supreme Court opinions have elaborated the nature of the "substantial evidence" test in review of nonscientific adjudications. In *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), Chief Justice Hughes described "substantial evidence" as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), the Supreme Court instructed that under this standard, "[a] court may [not] displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." In *Consolo v. FMC*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), the Court added that the standard of "substantial evidence" means "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."

Recent lower court decisions have elucidated a significant aspect of the "substantial evidence" test in review of scientific rulemaking. Recently, in *Industrial Union Department, AFL-CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467 (1974) (*cited with approval, FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978)), this court construed a section of the Occupational Safety and Health Act of 1970 that provides for judicial review of rulemaking under the "substantial evidence" test. The court distinguished between those administrative determinations that were "factual", and those that were "legislative" *i. e.*, involved policy judgments:

The Secretary's task thus contains "elements of both a legislative policy determination and an adjudicative resolution of disputed facts." *Mobil Oil Corp. v. FPC*, 157 U.S.App.D.C. 235, 254, 483 F.2d 1238, 1257 (1973). Although in practice these elements may so intertwine as to be virtually inseparable, they are conceptually distinct and can only be regarded as such by a reviewing court.

From extensive and often conflicting evidence, the Secretary in this case made numerous factual determinations. With respect to some of those questions, the evidence was such that the task consisted primarily of evaluating the data and drawing conclusions from it. The court can review that data in the record and determine whether it reflects substantial support for the Secretary's findings. But some of the *questions involved* in the promulgation of these standards are *on the frontiers of scientific knowledge*, and consequently as to them insufficient data is presently available to make a fully informed factual determination. *Decision making must in that circumstance depend to a greater extent upon policy judgments* and less upon purely factual analysis. Thus, in addition to currently unresolved factual issues, the formulation of standards involves choices that by their nature require basic policy determinations rather than resolution of factual controversies. Judicial review of inherently legislative decisions of this sort is obviously an undertaking of different dimensions.

162 U.S.App.D.C. at 338-39, 499 F.2d at 474-75 (footnotes omitted) (emphasis added). The central conclusion of *Industrial Union* —when an agency must resolve issues "on the frontiers of scientific knowledge," the reviewing court will uphold agency conclusions based on policy judgments in lieu of factual determinations— has gained acceptance in many statutory contexts. *See, e. g., American Iron & Steel*

---

injection of new matter into water that [the Act requires] a presumption of pollution . . .'" *Weyerhaeuser Co. v. Costle* (D.C. Cir. 1978),

191 U.S.App.D.C. at 341, 590 F.2d at 1043 (quoting Legislative History at 1332 (remarks of Sen. Buckley)).

*Institute v. OSHA*, 577 F.2d 825, 833–834 (3d Cir. 1978); *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. at 392–400, 541 F.2d at 20–28; *National Asphalt Pavement Association v. Train*, 176 U.S.App.D.C. 296, 304–05, 539 F.2d 775, 783–84 (1976); *Society of the Plastics Industry v. OSHA*, 509 F.2d 1301, 1308 (2d Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975); *cf. FCC v. National Citizens Committee for Broadcasting*, 436 U.S. at 814, 98 S.Ct. 2096 (broadcast licensing); *Superior Oil Co. v. FERC*, 563 F.2d 191, 201 (5th Cir. 1977) (information disclosure).

### D. *Adequacy of the Basis for EPA Regulations.*

#### 1. EPA's policy judgments concerning extrapolation.

Industry petitioners contend that EPA lacked an adequate basis for the regulations under review because of the incomplete scientific knowledge about less chlorinated PCBs. In effect, they assert that EPA must demonstrate the toxicity of each chemical it seeks to regulate through studies demonstrating a clear line of causation between a particular chemical and harm to public health or the environment. We do not agree.

The principal basis for rejecting petitioners' views is the wording of the statute. As we stated, the "ample margin of safety" provision directs EPA to guard against incompletely known dangers. EPA, in its expert policy judgment, relied on its knowledge about a known substance to assess the danger of one about which less is known. Petitioners suggest no alternative approach for the agency short of waiting for conclusive proof about the danger posed by a less understood substance. However, by requiring EPA to set standards providing an "ample margin of safety," Congress authorized and, indeed, required EPA to protect against dangers before their extent is conclusively ascertained. The statute thus does not deny EPA the authority that petitioners would have us withhold. Indeed, the legislative history indicates that Congress intended EPA to take into account "the availability of data on similar substances or compounds."[74] Moreover, the Clean Water Act of 1977 supports the notion that extrapolation from data about related substances is a valid approach. In 1977, Congress did not list individual substances, but rather listed families of substances,[75] recognizing that similarities among substances render them susceptible to regulation by group.[76]

Proper deference in judicial review to the scientific expertise of the Administrator also militates against precluding EPA from regulating less chlorinated PCBs on the basis of what is known about related substances. *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. at 338–39, 499 F.2d at 474–75.[77] The risks posed by toxic substances, and the extent to which one substance has effects similar to those of related substances, are matters on the frontiers of scientific knowledge. EPA, not the court, has the technical expertise to

---

**74.** Legislative History at 1496 (Senate Report) (discussion of definition of toxic pollutant).

**75.** 43 Fed.Reg. 4108; *see* note 40 *supra* & accompanying text.

**76.** Senator Randolph, one of the conference managers for the Clean Water Act of 1977, explained that, under the new provision, "the Administrator may specify limitations for individual compounds or members of families of listed pollutants, or the Administrator may establish a limitation for an entire generic class of a listed pollutant. His judgment in choosing between these approaches is not subject to review." 129 Cong.Rec. S19663 (daily ed. Dec. 15, 1977). We do not rely directly on the fact that PCBs were one family under the Clean Water Act of 1977, *see* note 75 *supra*, since the regulations under review were promulgated under the 1972 Act, and since the approach that EPA took in this proceeding was not limited to substances within a congressionally classified "family." Rather, we cite the Clean Water Act of 1977 as one indication that EPA is correct in contending that related chemicals have similar enough properties that extrapolation from data about one chemical may be employed in regulating another.

**77.** *See generally EDF v. EPA* [aldrin and dieldrin], 167 U.S.App.D.C. 71, 73, 510 F.2d 1292, 1294 (1975), text at ----- of 194 U.S.App.D.C., at 87 of 598 F.2d *infra*.

decide what inferences may be drawn from the characteristics of related substances and to formulate policy with respect to what risks are acceptable.[78]

Moreover, we are currently in a period of rapid change in assessing and regulating toxic substances. TSCA has established new regulatory mechanisms that may well lead to wholesale estimation of the risks of toxic substances.[79] A holding from this court that only one technique of risk assessment (such as "extensive studies on comparative mammalian toxicity", Brief of Industry Petitioners at 53) is acceptable to the

detriment of others would unnecessarily inhibit EPA from evaluating new approaches and formulating appropriate policy.

Finally, in reviewing EPA's policy of regulating less chlorinated PCBs in part on the basis of what is known about more chlorinated PCBs, we must recognize considerations of administrative feasibility.[80] The number of toxic substances subject to regulation seems very large.[81] Regulation of so many substances could well be extremely difficult if EPA were precluded from drawing inferences from available data on well-known,

---

**78.** This is particularly so because the relations between substances range over a spectrum. At one end, there are chemicals so similar that only the most sophisticated scientific procedures can distinguish them. At the other end, there are broad classes of chemicals, such as chlorinated hydrocarbons or organochlorine compounds, encompassing many substances that share significant similarities. Even for broad classes, responsible scientific opinion is beginning to suggest that the similarities that exist provide a basis for overall action. As stated in the Sixth Annual Report of the Council on Environmental Quality 108 (1975) (emphasis added):

> Relatively few chemicals have had to be regulated because of environmental or health hazards. A very significant proportion of those regulated chemicals are organochlorine compounds, including DDT, aldrin-dieldrin, heptachlor-chlordane, hexachlorophene, and vinyl chloride. Other organochlorines, including nearly all pesticides of this class, are currently under scrutiny. Among these are PCB's, mirex, tricholoethylene, hexachlorobenzene, carbon tetrachloride, and chloroform, to name a few. Chlorination of drinking water supplies and industrial effluents has come under question because the process apparently forms cancer-causing organochlorines.
>
> Thus, it appears that *organochlorine compounds as a class are becoming suspect* of causing a significant share of ecological and health problems resulting from chemicals in the environment.

For the court to state as a matter of law at what point on this spectrum of chemical similarity inference may begin, and at what point it must end, would be inconsistent with our limited judicial function. *Indus. Union Dep't. AFL CIO v. Hodgson*, 162 U.S.App.D.C. 331, 336 -40, 499 F.2d 467, 472 76 (1974).

**79.** It is anticipated that the Toxic Substances Control Act will lead to experience with a number of approaches to risk assessment. These include inferences about likely carcinogenicity

based on microbial data, *see, e. g.*, McCann & Ames, *The* Salmonella/*Microsome Mutagenicity Test: Predictive Value for Animal Carcinogenicity*, in Book C, H. Hiatt, J. Watson, & J. Winsten, Origins of Human Cancer, (hereafter, Human Cancer) 1431 -50 (1977); and use of living organisms *in situ* for monitoring environmental effects of chemicals, *see, e. g., Toxic Chemical Hearings, supra* note 17, at 283–86 (EPA testimony); Williams, *Biology Article Reviews: 1976*, 1 Harv.E.L.Rev. 674, 680–83 (1976). Further experience will also be gained with estimating the risks of unknown substances on the basis of known related substances. *See* Epstein, *The Carcinogenicity of Organochlorine Pesticides*, in Book A, Human Cancer, *supra*, at 243 46.

**80.** It must be recalled that the previous regulatory attempts failed in large part for lack of appropriate data, and that Congress has sought to prevent other similar failures in the future. *See* notes 17 19 *supra* & accompanying text.

**81.** The Clean Water Act of 1977 listed 65 families, containing at least 129, and possibly thousands of individual substances. *See* 8 Envir. Rep. (BNA) 1131 (1977). Moreover, this listing was intended only as a beginning; the number of potentially toxic substances must be reckoned in the thousands. "Recalling that there are some 30,000 chemicals in commerce today, any chemical-by-chemical approach to establishing toxicity standards appears rather unsatisfactory unless carefully targeted toward the most suspect substances. . . . Industry will undoubtedly soak up much of the scientific expertise available if it wishes to continue offering new chemicals into commerce at the present rate of 700 -1000 a year." *Memorandum on Regulation and Monitoring of Toxic and Hazardous Chemicals under the Federal Water Pollution Control Act by the Staff of the Subcomm. on Investigations and Review of the House Comm. on Public Works and Transportation*, 123 Cong.Rec. H12929, 12931 (daily ed. Dec. 15, 1977).

related substances. Moreover, requiring proof of causation for each chemical would force EPA to expend resources in areas that are well-enough known so that inference is acceptable, when those resources could be otherwise employed in areas where knowledge is inadequate. In ruling on the type of proof and procedure required for making individual determinations, the Supreme Court has construed statutes protecting the environment and public health in light of considerations of administrative feasibility. See E. I. du Pont de Nemours & Co. v. Train, 430 U.S. at 132, 97 S.Ct. 965 (type of proof);[82] Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 62-22, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (procedure).[83] See also United States v. Storer Broadcasting Co., 351 U.S. 192, 202 05, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

2. EPA's factual determination of the particular risks here.

■■■ We now review the evidence presented by EPA, industry petitioners, and others. EPA did not rely on a single approach or study, but acted on the basis of a

variety of studies and types of evidence. Under the substantial evidence test, it is not necessary that all the evidence, or even most of the evidence, point in one direction. The evidence supporting the agency's conclusion must be such, in light of all of the evidence on the record as a whole, that "a reasonable mind might accept [it] as adequate to support [the] conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. at 229, 59 S.Ct. at 217. The evidence on scientific matters need not consist of one dispositive study, but may be varied and cumulative.[84]

We have structured our review under the "substantial evidence" test according to the primary factors of section 307(a)(2): toxicity (including carcinogenicity), persistence, and degradability as they relate to affected organisms.[85]

a. Toxicity

The evidence presented concerning toxicity may be divided into (i) evidence bearing on aquatic organisms, (ii) evidence bearing on man, and (iii) evidence concerning the special quality of carcinogenicity.

82. The Supreme Court stated in E. I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 132, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312 (1968)): "'"[C]onsiderations of feasibility and practicality are certainly germane" to the issues before us. Bowles v. Willingham [321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892,] 517, 64 S.Ct. 641. We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.'"

83. The Supreme Court stated in Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 621, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973), holding that individual proceedings were not required for each of the thousands of drugs subject to regulation: The NAS NRC panels evaluated approximately 16,500 claims made on behalf of the 4,000 drugs marketed pursuant to effective NDA's in 1962. Seventy percent of these claims were found not to be supported by substantial evidence of effectiveness, and only 434 drugs were found effective for all their claimed uses. If FDA were required automatically to hold a hearing for each product whose efficacy was questioned by the NAS NRC study, even though many

hearings would be an exercise in futility, we have no doubt that it could not fulfill its statutory mandate to remove from the market all those drugs which do not meet the effectiveness requirements of the Act.

84. For example, in Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 409 10, 541 F.2d 1, 37-38 (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (footnote omitted), EPA regulated lead additives in gasoline based on a number of suggestive studies, rather than one dispositive study. This court upheld EPA's approach: Contrary to the apparent suggestion of some of the petitioners, we need not seek a single dispositive study that fully supports the Administrator's determination. Science does not work that way; nor, for that matter, does adjudicatory fact-finding. Rather, the Administrator's decision may be fully supportable if it is based, as it is, on the inconclusive but suggestive results of numerous studies. By its nature, scientific evidence is cumulative: the more supporting, albeit inconclusive, evidence available, the more likely the accuracy of the conclusion.

85. See text supra at of 194 U.S. App.D.C., at 79 80 of 598 F.2d.

i. Aquatic organisms

EPA's Criteria Document, *see* App. II, and evidentiary affidavits summarized studies concerning adverse effects of all PCBs on a wide range of aquatic organisms. PCBs showed some variation in toxicity: sometimes less chlorinated PCBs were more toxic than more chlorinated PCBs, and sometimes vice-versa, with few systematic tendencies. 42 Fed.Reg. 6534, 6541.[86]

Petitioners contended that EPA's evidence as to aquatic effects does not support a prohibition. They pointed out that EPA found that aquatic organisms could live with a minimal level of PCBs in the water.[87] Indeed, EPA originally proposed a low effluent standard for PCBs rather than a prohibition. New evidence concerning effects on mammals, not effects on aquatic organisms, led to the prohibition. However, this is not to say that EPA's prohibition is unsupported by the aquatic evidence. Although mammalian evidence appears to have tipped the scales, the evidence concerning aquatic dangers lent support to a prohibition. That evidence showed that, even at low levels of discharge, PCBs might build up over time to levels that would menace aquatic organisms.[88]

ii. Man

EPA's Criteria Document and evidentiary affidavits summarized studies concerning adverse effects of PCBs on a wide range of mammals. EPA deemed the animal studies relevant, in part because some mammals are exposed to PCBs in their fish diet, *e. g.,* domesticated mink, but mainly because mammalian data reflect risks to humans that cannot be readily determined through studies about humans. For the reasons previously discussed, the Criteria Document summarized many studies on more chlorinated PCBs,[89] but almost none on less chlorinated PCBs. *See* note 66 *supra* & accompanying text. After the preparation of the Criteria Document, during the hearings EPA brought forth a few recent studies about the effects of less chlorinated PCBs. These studies lacked the wealth of detail of the studies on more chlorinated PCBs, but did show ill effects.[90]

In addition to animal studies, EPA summarized some studies on humans, relating to occupational diseases[91] and poisoning in-

---

**86.** PCBs were shown to inhibit the growth of estuarine bacteria, App. II 75–86 (Aroclor 1016 & 1242), and were shown to have toxic effects on phytoplankton, App. II 86–104 (Aroclor 1242). Toxic effects on these microorganisms were deemed important by EPA because these organisms are at the base of crucial food chains for fish. 42 Fed.Reg. 6532, 6534 (1977). Chemicals that destroy or alter the populations of microorganisms cause destruction or alteration of the populations of the fish that feed on them. Similarly, PCBs were shown to have toxic effects on fresh water crustaceans, App. II 104–10 (Aroclor 1242); on fresh water insects, App. II 110–11; on salt water (estuarine) crustaceans, such as shrimp, App. II 111–13 (Aroclor 1016 & 1242); and on molluscs, such as oysters, App. II 114. PCBs, including Aroclor 1016, were shown to have toxic effects on fish, App. I 98–100, 104–106, App. II 114–33, and on birds, including fish-eating birds, App. II 134–71.

**87.** EPA found that there could be a minimal level of PCBs in the water that would be "substantially below the lowest observed effect levels in aquatic organisms," even taking bioaccumulation into account. 42 Fed.Reg. 6548.

**88.** In setting its final standard, EPA relied on factors other than toxicity, including "bioaccumulation, persistence, and transport." *Id.* at 6550. Essentially, once it had been shown that PCBs were persistent—that they built up in the environment—EPA concluded that even low, tolerable levels of discharge were dangerous because they might lead, over time, to a build-up of intolerable levels. *Id.*

**89.** EPA's Criteria Document summarized studies in which more chlorinated PCBs were shown to have toxic effects on bats, mice, rats, rabbits, mink, swine, dogs, and rhesus monkeys. App. II 172–205.

**90.** These studies showed that Aroclor 1242 had toxic effects on rhesus monkeys and rats, App. I 118, and Aroclor 1016 had toxic effects on rats and mink, App. I 148–49, 151–58, 331–34.

**91.** Workers exposed to PCBs were shown to have developed an occupational disease known as chloracne, which produces both skin problems and, in cases of vapor inhalation, serious digestive and other complications. App. II 255.

cidents.[92] These studies dealt only with effects of more chlorinated PCBs.

In opposition, industry petitioners criticized EPA's studies of less chlorinated PCBs.[93] They sought to minimize evidence of the effects of more chlorinated PCBs by asserting that less chlorinated PCBs were different.[94]

We hold that EPA's toxicity evidence provided support for the prohibition. It is well established that evidence concerning toxic effects on mammals is probative of dangers to man. "Although extrapolation of data from mice to men may be quantitatively imprecise, it is sufficient to establish a 'substantial likelihood' that harm will result." *EDF v. EPA* [aldrin and dieldrin], 167 U.S.App.D.C. 71, 78, 510 F.2d 1292, 1299 (1975). Similarly, evidence concerning occupational diseases and incidents of poisoning appears to be very probative of dangers to man.[95]

As we have held, EPA did not err in using data generated in studies of more chlorinated PCBs in dealing with less chlorinated PCBs. Industry petitioners' criticisms of EPA's studies of less chlorinated PCBs, while relevant, do not preclude EPA from considering the studies to be support for a prohibition.

### iii. Carcinogenicity

In the EPA proceedings, as in the public debate over PCBs,[96] an issue of considerable importance was whether PCBs cause cancer. EPA introduced studies showing that exposure to more chlorinated PCBs produces cancer and cancer-like growths in rats. App. II 251 53 & Appendix D. EPA also introduced studies showing that more chlorinated PCBs are mutagenic, App. II 254, which, according to commentators, suggests that they may be carcinogenic.[97] Finally, EPA introduced studies that PCBs, including less chlorinated PCBs, are enzyme inducers,[98] indicating that they may be cocarcinogenic—that is, that they may produce cancer when they act in combination with other substances.[99] EDF introduced evidence showing that on-the-job exposure to more chlorinated PCBs decades ago resulted eventually in a high incidence of cancer. App. I 168.

*General Electric Co.*, 6 Envir.L.Rep. (Envir.Law Inst.) at 3001 4; Allen & Norback, *Carcinogenic Potential of the Polychlorinated Biphenyls*, in Book A, Human Cancer, *supra* note 79, at 173–86.

92. Persons exposed to heavy doses of PCBs in their diet were shown to develop a range of severe and disabling ailments. App. II 257 70 (the Yusho incident); *see* note 31 *supra*.

93. Industry petitioners introduced testimony by a distinguished toxicologist who found problems in the recent studies, such as using a few test animals, using high doses of PCBs, and drawing the more alarming of alternative plausible conclusions from the data. App. I 227 47.

94. Industry petitioners contended that less chlorinated PCBs were more easily metabolized and eliminated from the body than more chlorinated PCBs.

95. Not surprisingly, the occupational disease and poisoning studies in this case concerned exposure to extremely large doses of the toxic substance. However, the studies are still supportive. High exposures have resulted in high disease incidence; EPA could conclude that any exposure will result in some disease incidence in a large population. Importantly, such studies provide detail on particular mechanisms of toxic substance activity in humans which cannot be garnered in animal studies. *See* 42 Fed.Reg. 6537.

96. *See, e. g.,* T. Corbett, Cancer and Chemicals, Ch. 9, "Polychlorinated Biphenyls" (1977);

97. *See* McCann & Ames, *supra* note 79.

98. An enzyme is a body protein that speeds up the rate of a biochemical reaction. An enzyme inducer is a substance that stimulates the body to produce more enzyme.

99. *See* App. I 131 33. It is well accepted that some substances are co-carcinogens. The issue between EPA and industry petitioners is what causes co-carcinogenicity. One scientific theory, used by EPA to support its regulations, is that enzyme inducers are co-carcinogenic, because an enzyme inducer stimulates the body to produce enzymes, and the enzymes then cause potentially carcinogenic substances in the body to become actual carcinogens. *Id.* Toxic standards were intended by Congress to protect against co-carcinogens as well as carcinogens. "[A]ny pollutant or agent which lowers an organism's resistance to serious disease should be considered a toxic pollutant." Legislative History at 1495 (Senate Report).

Industry petitioners respond that the evidence that less chlorinated PCBs are carcinogenic is far from conclusive. Again, they earnestly contend that evidence concerning more chlorinated PCBs fails to support regulation of less chlorinated PCBs. In response to the studies showing that less chlorinated PCBs are enzyme inducers, they introduced expert testimony disputing that enzyme inducers are necessarily carcinogenic or co-carcinogenic. "The role of enzyme induction, especially in chemical carcinogenesis, is not as yet very well understood. . . . [I]t must remain highly speculative to deduce enhancement of chemical carcinogenesis by enzyme induction by PCBs." App. I 234 (testimony of Dr. Mueller).

After review of the authorities on the difficult issue of carcinogenic effect, we conclude that EPA's evidence furnishes adequate support for its prohibition. An administrator has a "heavy burden" to "explain the basis for his decision to permit the continued use of a chemical known to produce cancer in experimental animals." *EDF v. Ruckelshaus* [DDT], 142 U.S.App. D.C. 74, 86, 439 F.2d 584, 596 n. 41 (1971); *accord, EDF v. EPA* [heptachlor and chlordane], 179 U.S.App.D.C. 43, 50, 548 F.2d 998, 1005 (1976), *cert. denied*, 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); *EDF v. EPA* [aldrin and dieldrin], 167 U.S.App. D.C. at 74, 510 F.2d at 1302; *see EDF v. Department of Health, Education and Welfare*, 138 U.S.App.D.C. at 388–90, 428 F.2d at 1090–92. When firm evidence establishes that a chemical is a carcinogen, statutes generally leave an administrator no alternative but to step in to protect the public.

On the other hand, when the evidence is less than firm, but merely suggests that a chemical may be a carcinogen, the same "heavy burden" may not attend administrative inaction. The decision to act in such a case has been held to fall within the discretion of the Administrator. For example, in *Reserve Mining Co. v. EPA*, 514 F.2d 492 (8th Cir. 1975) (en banc), EPA sought to abate discharge of mining refuse into Lake Superior "under an acceptable but unproved medical theory," that the discharges

were carcinogenic. 514 F.2d at 529. The court concluded that the discharges should be abated, even though there would be a heavy cost, including possible loss of many jobs, to the local economy. *Id.* at 514–20, 535 40. Similarly, in *Certified Color Manufacturers Association v. Mathews*, 177 U.S. App.D.C. 137, 150, 543 F.2d 284 (1976), the Food and Drug Administration (FDA) terminated its provisional approval of a color additive used to dye food on the basis of a vigorously debated study of the additive's carcinogenic effects. This court concluded that the FDA action should be upheld, based upon FDA's scientific judgment that the study was not conclusive, but was merely suggestive of carcinogenicity. *Id.* 177 U.S.App.D.C. at 150, 543 F.2d at 297. "Courts have traditionally recognized a special judicial interest in protecting the public health, particularly where 'the matter involved is as sensitive and fright-laden as cancer.' Where the harm envisaged is cancer, courts have recognized the need for action based upon lower standards of proof than otherwise applicable." *Id.* 177 U.S. App.D.C. at 150, 543 F.2d at 297–98 (footnotes omitted) (quoting *EDF v. EPA* [DDT], 150 U.S.App.D.C. 348, 358, 465 F.2d 528, 538 (1972)). The courts have frequently upheld regulations based on evidence of carcinogenic effects. *See, e. g., American Iron & Steel Institute v. OSHA*, 577 F.2d at 840, 841 (coke oven emissions); *Society of the Plastics Industry v. OSHA*, 509 F.2d at 1311 (vinyl chloride); *Synthetic Organic Chemical Manufacturers Association v. Brennan*, 506 F.2d 385, 387 (3d Cir. 1974) (industrial chemicals), *cert. denied*, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 48 (1975); *Synthetic Organic Chemical Manufacturers Association v. Brennan*, 503 F.2d 1155, 1159–60 (3d Cir.) (same), *cert. denied*, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1974).

These cases demonstrate the inevitable tension attending regulation of carcinogens. Frequently, such regulations have severe economic impact. Indeed, sometimes, as alleged by industry petitioners in this case, such regulations may jeopardize plants or whole industries, and the jobs depending on

them. In such circumstances, the temptation to demand that the agency furnish conclusive proof of carcinogenicity as support for the regulations is great. However, the decision to delegate authority to an agency to control suspected carcinogens is a legislative judgment that is not open to question in this court. Congress's direction to EPA to protect against incompletely understood dangers could not be carried out if we were to adopt the proof requirements advocated by industry petitioners.

What scientists know about the causes of cancer is how limited is their knowledge.[100] The record in this case demonstrates that it may take decades for human exposure to carcinogens to result in cancer;[101] in the meantime, the case for inferring a cancer danger with respect to an incompletely understood substance is vigorously disputed. If regulation were withheld until the danger was demonstrated conclusively, untold injury to public health could result. Accordingly, we find that Congress has allowed EPA to support a prohibition on the basis of strongly contested and merely suggestive proof. We conclude that the evidence in this case is at least suggestive of

carcinogenicity and thus supports EPA's decision.

#### b. Persistence

EPA summarized studies showing that PCBs tend to accumulate in the environment over many years, are mobile, and adhere to sediments.[102] This court has noted before that such characteristics intensify the dangers posed by toxic substances, because they increase the exposure of persons and vulnerable organisms of all kinds to those substances. *See EDF v. EPA* [heptachlor and chlordane], 179 U.S.App.D.C. at 53, 548 F.2d at 1008; *EDF v. EPA* [aldrin and dieldrin], 167 U.S.App.D.C. at 73, 510 F.2d at 1301.[103] Accordingly, these studies provide support for EPA's prohibition.

#### c. Degradability

EPA summarized a number of studies concerning the degradation of both less and more chlorinated PCBs by living organisms. PCBs were shown to resist degradation, to bioaccumulate (build up) to high levels in simple organisms, and then to bioaccumulate further as those simple organisms are

**100.** The Sixth Annual Report of the Council on Environmental Quality at 12, 17 stated that

Discovering links between chemicals and health problems is a slow process, usually succeeding only after a relatively long history of use or exposure. In the meantime, however, chemical development proceeds at a rapid pace. About 2 million chemical compounds are known, and each year thousands more are discovered by the U.S. chemical industry and hundreds are introduced commercially. We know very little about the possible health consequences of these new compounds. Many are not toxic, but the sheer number of chemical compounds, the diversity of their use, and the adverse effects already encountered from some make it increasingly probable that chemical contaminants in our environment have become a significant determinant of human health and life expectancy.

. . . . .

Most of the details of how and why cancers develop still elude scientists and physicians, so that the exact causative factors of observed malignancies cannot be defined.

**101.** App. I 168. "It usually takes 15 40 years between exposure to a cancer-producing chem-

ical and manifestation of the disease." *Id.* at 27.

**102.** More chlorinated PCBs were shown to have accumulated to high levels over years and even decades in some places, although, in other places, their levels in the environment may be leveling off and/or declining as discharges are controlled. App. I 137, App. II 276–77, 341–42. PCBs were shown to be highly mobile, being detectable in fish at all 100 stations in the National Pesticide Monitoring Program due to the transport of PCBs by both air and water. App. II 282, 341. PCBs were shown to adhere to sediments and particulates, causing them to be stored and continually reintroduced into water bodies from the reserves adhering to those sediments. App. II 282.

**103.** Tendencies of substances to accumulate lead to their build-up in the environment to high levels; mobility leads to exposure of persons and other vulnerable organisms at some distance from the point of discharge; and adherence to sediments results in storage of toxic substance in the beds of waterways and constant reintroduction into circulation.

consumed by higher organisms.[104] 42 Fed. Reg. 6539–41. When degradation does occur, it may result in creation of other harmful substances, either as intermediates, or as end products of degradation.[105] Industry petitioners disputed EPA's evidence, and produced their own evidence that less chlorinated PCBs are more easily metabolized and eliminated, and less likely to bioaccumulate than more chlorinated PCBs. They also contended that these substances degrade by safe routes into non-dangerous substances. App. I 209–12, 237‑39.

However, the conclusions advanced by industry petitioners do not necessarily weaken the support for EPA's prohibition. It was not necessary for EPA to prove that less chlorinated PCBs were as dangerous as more chlorinated PCBs in order to justify a prohibition. The central issue is not whether less chlorinated PCBs are less degradable than more chlorinated PCBs, but whether less chlorinated PCBs are insufficiently degradable. Our task in reviewing the record is not to choose between these conflicting studies, but rather to determine whether EPA's decision had substantial evidence on the whole record. Viewed as a whole, the record provided substantial support for EPA's conclusions.

3. Conclusion.

▮▮▮▮ Under the substantial evidence standard of review, EPA is not required to "prove" its case in the reviewing court "in some sense of weight of the evidence." *EDF v. EPA* [heptachlor and chlordane], 179 U.S.App.D.C. at 50, 548 F.2d at 1005. Its policy decisions are subject to deferential review, and its factual conclusions are upheld although they may not be supported by all the evidence, or even by most of it. It suffices that EPA's conclusions are sup-

ported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion[s]." *Consolidated Edison Co. v. NLRB*, 305 U.S. at 229, 59 S.Ct. at 217. On this record, it is clear that EPA's prohibition on discharges of PCBs must be upheld.

## VI. PETITIONS BY EDF AND BASS.

### A. *Petition by EDF.*

EDF petitioned for review of EPA's failure to perform its duty to cover an alleged "loophole" in the PCBs prohibition: EPA's regulations apply only to current manufacturers and users of PCBs. EDF contends that past manufacturers and users who have ceased making or using PCBs continue the use of sewer pipes and other equipment contaminated with PCBs, and that the resulting discharges will continue to introduce PCBs into the nation's waters. Because EPA's findings show that continuing PCBs pollution is dangerous, EDF contends that EPA should promulgate additional regulations concerning past manufacturers and users. EDF does not specify whether EPA's alleged duty to close this "loophole" is mandatory or discretionary, but presumably urges that EPA's failure to act may be countermanded either as a failure to perform a mandatory duty or as an abuse of discretion.

▮▮▮▮ We do not reach EDF's arguments on the merits, for we conclude that these arguments may only be presented to a district court.[106] EPA's proposals in its notice of proposed rulemaking covered existing manufacturers and users of PCBs, not former manufacturers and users. 41 Fed.Reg. 30468. Therefore, this proceeding did not focus on them, nor was it intended to deal

---

**104.** For example, microorganisms collect in their bodies the PCBs in the water, and PCBs are further concentrated as, successively, the microorganisms are consumed by invertebrates, the invertebrates by small fish, the small fish by larger fish, and the large fish by man.

**105.** The degree of resistance to degradation varied among types of PCBs and organisms, but there was resistance in all circumstances. App. II Appendix E 13–16. Studies indicated

that degradation occurred by transformation of PCBs first into an intermediate form, arene oxides, that are highly reactive and dangerous to the body, and only then into safer forms. App. II Appendix E 14–16; App. I 144.

**106.** Our ruling, of course, neither concerns nor is it intended to govern, any future use of the agency record of this proceeding.

with the issues that concern EDF. In essence, EDF contends that EPA should have engaged in an additional rulemaking proceeding. Jurisdiction over EDF's claim lies only in the district court. *See* Currie, *Judicial Review under Federal Pollution Laws*, 62 Iowa L.Rev. 1221, 1250 (1977) ("When there has been no proceeding, there is no administrative record, and, consequently, greater likelihood of need for a trial; therefore, the district court is the appropriate forum.").

Jurisdiction lies in a district court whether EPA's alleged duty is mandatory or discretionary. If the duty is mandatory, section 505 of the 1972 Act, 33 U.S.C. § 1365 (1976), expressly confers jurisdiction on the district court. *See Ethyl Corp. v. EPA*, 176 U.S.App.D.C. at 386 n. 21, 541 F.2d at 14 n. 21 (Clean Air Act). *See generally NRDC v. Train*, 545 F.2d 320 (2d Cir. 1976) (Clean Air Act). If the duty is discretionary, jurisdiction over the claim that EPA abused its discretion lies in district court. *NRDC v. Train*, 171 U.S.App.D.C. at 155, 519 F.2d at 291.[107] Accordingly, without deciding the legal nature of EPA's alleged duty, we conclude that EDF's petition must be dismissed without prejudice to litigation in the appropriate forum.

B. *Petition by BASS.*

██ The Bass Anglers Sportsman Society of America (BASS) petitioned for review of EPA's regulations on several grounds: that EPA's choice of an "acceptable analytical method" for measuring PCBs discharges was inadequate, and that EPA's failure to promulgate other toxic or pretreatment regulations was arbitrary and capricious. Because BASS did not participate in EPA's PCBs proceedings, its petition must be dismissed. *See Nader v. NRC*, 168 U.S.App. D.C. 255, 264–65, 513 F.2d 1045, 1054·55 (1975).

**107.** In *NRDC v. Train*, 171 U.S.App.D.C. 151, 161, 519 F.2d 287, 297 (1975), this court held that jurisdiction to review EPA's failure to perform a discretionary duty was conferred on the district court by the Administrative Procedure Act, 5 U.S.C. §§ 551-706 (1976). Subsequently, the Supreme Court held that the Adminis-

## VII. CONCLUSION

For the foregoing reasons, we· uphold EPA's regulations prohibiting discharges of PCBs, and dismiss the petitions of EDF and BASS.

*So ordered.*

trative Procedure Act does not afford subject matter jurisdiction, noting the adequacy of the general federal question statute, as amended, 28 U.S.C.A. § 1331 (1978). *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).