In the Matter of PENN CENTRAL
TRANSPORTATION
COMPANY, Debtor,

Re: Pollution and Toxic Tort Claims.

Bankruptcy No. 70–347.

United States District Court,
E.D. Pennsylvania.

Jan. 14, 1988.

Kenneth N. Hart, Charles Evan Stewart, Donovan, Leisure, Newton & Irvine, New York City and Robert J. Siverd, The Penn Cent. Corp. Philadelphia, Pa. for Penn Cent. Corp.

David Richman, Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa. for Consolidated Rail Corp.

Steven J. Englemyer, Asst. U.S. Atty., Philadelphia, Pa., for the Government.

Patrick T. Ryan, Joseph A. Dworetzky, Drinker, Biddle & Reath, Philadelphia, Pa., for SEPTA.

Arnold E. Cohen, Lauri Sussman Siegel, Zarwin, Baum, Resnick & Cohen, Philadelphia, Pa. and Joseph C. Kohn, Kohn, Savett, Klein & Graf, Philadelphia, Pa., for petitioners Burrell and Brown.

Arnold Levin, Levin and Fishbein, Philadelphia, Pa., and Arnold E. Cohen, Philadelphia, Pa., for Central Real Estate.

Edward I. Borden, Jr., Bergstrom & Borden, Philadelphia, Pa., for Valley Forge Chapter of Trout Unlimited.

## MEMORANDUM AND ORDER 4311

FULLAM, Chief Judge.

Several petitioners seek leave to sue Penn Central Corporation (PCC), on account of the activities of the Debtor, Penn Central Transportation Company (PCTC) during its ownership and operation of a rail yard in Paoli, Pennsylvania.

### I.

The relevant facts are largely undisputed. Where there may possibly be lingering controversy, I will assume the truth of petitioners' allegations.

The Paoli Railroad Yard in Chester County, Pennsylvania is a 23–acre facility about 15 miles west of Philadelphia. There, since the 1930s, PCTC and one of its predecessors (the Pennsylvania Railroad Company) used and serviced transformers that contained polychlorinated biphenyls (PCBs). These chemicals leaked or were dumped into the Railroad Yard.

Beginning in the mid–1960s and to a greater extent as time went on, such soil contamination has been recognized as hazardous. *See Environmental Defense Fund v. Environmental Protection Agency,* 598 F.2d 62, 65–71 (D.C.Cir.1978). However, PCBs found their way into the soil at Paoli Yard throughout PCTC's ownership of the tract, and apparently for some time thereafter. Meanwhile, during the early 1970s, mounting evidence documenting PCBs' toxicity caused public and

governmental pressure to reduce the danger. *Environmental Defense Fund*, at 66 & n. 4 (citing a 1972 report by a Federal Interagency Task Force, "Polychlorinated Biphenyls and the Environment"). For its part, the Environmental Protection Agency (EPA) began promulgating protective regulations. *E.g.*, 38 Fed.Reg. 24342, 24343 (Sept. 7, 1973) (PCBs included on list of toxic water pollutants); 38 Fed.Reg. 35388, 35395 (Dec. 27, 1973) (proposed effluent standards for PCBs); *see also* 37 Fed.Reg. 5705 (Mar. 18, 1972) (Food and Drug Administration proposed rule on PCBs in food); 38 Fed.Reg. 18096 (July 6, 1973) (final rule). Although the initial regulatory effort stalled, *see Environmental Defense Fund*, 598 F.2d at 68–69 & nn. 17–20, investigators continued developing the evidence, including the evidence of adverse effects caused by PCBs in electric rail equipment, *see, e.g., id.* at 70 (noting EPA's commissioned survey of the scientific literature on PCBs and its sponsorship of a national conference on PCBs in November 1975).

These problems were directly related to the Paoli Yard when, among several widely-publicized PCB-related accidents, on April 16, 1974, a train running between Philadelphia and Paoli spilled a substantial quantity (10 to 100 pounds) of PCBs. *See* Boyle, "The Spreading Menace of PCB," *Sports Illustrated* 20 (Dec. 1, 1975); Star, "American and Japanese Controls on Polychlorinated Biphenyls," 1 *Harv.Envir.L. Rev.* 561, 564 n. 29 (1976). However, neither this particular incident nor the general PCB problem surfaced in the course of the bankruptcy litigation process.

Similarly and more importantly, when drafting a federal program to save northeastern and midwestern railroad systems from extinction legislators did not explicitly consider the significance of PCBs at railroad yards. Thus, responsibility for PCB cleanup nowhere was specified in the Regional Railroad Reorganization Act of 1973 (Rail Act), 45 U.S.C. § 701 *et seq.*

Under the Rail Act, 45 U.S.C. § 743(b), essentially all PCTC's rail-related properties were transferred on April 1, 1976, to the statutorily-created (45 U.S.C. § 741 *et seq.*) Consolidated Rail Corporation (Conrail); Conrail, the same day, granted the statutorily-created (45 U.S.C. § 501 *et seq.*) National Railroad Passenger Corporation (AMTRAK) title (but retained an easement) to the Railroad Yard. As compensation, pursuant to the Rail Act, 45 U.S.C. § 716(d)(1), PCTC obtained an entitlement to Conrail securities and government-guaranteed certificates of value, with value to be calculated during later, statutorily-authorized (45 U.S.C. § 746(c)(4)), valuation proceedings.

Meanwhile, EPA's regulatory effort proceeded apace. *See, e.g.*, 41 Fed.Reg. 14134 (April 1, 1976) (recommended procedures for disposal of PCB-contaminated waste); 41 Fed.Reg. 30468 (July 23, 1976) (proposed effluent standards for PCB discharges); 42 Fed.Reg. 6532 (Feb. 2, 1977) (final effluent standards for PCB discharges, more stringent than those proposed). New legislation enacted in October 1976, the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq.*, and the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.*, gave EPA new power to regulate. In particular, see 15 U.S.C. § 2605(e), singling out PCBs for strict and expedited regulation.

Thus, by the mid–1970s, the federal government knew of the potential for substantial PCB pollution at railroad yards where electric power transformers had been serviced or disposed. *See also* Council on Environmental Quality, *Seventh Annual Report* 44–46 (1976) (describing PCB pollution and linking it to railroad companies' use of large capacitors and transformers); 43 Fed.Reg. 24802, 24808 (June 7, 1978) (discussing PCB-containing fluid in transformers on locomotives operated by AMTRAK, Conrail, and other transit companies, noting that these PCBs regularly escape to pollute the environment). In March 1978, "for the purpose of assessing the current and future use of PCB at railroad yards," four EPA representatives visited the Paoli site and others in the northeast corridor. (Letter from United States Attorney Edward S.G. Dennis, Jr., Oct. 1, 1986).

On March 17, 1978 this court approved the PCTC reorganization plan. *In re Opinion Approving Plan of Reorganization (In re PCTC)*, 458 F.Supp. 1234 (E.D. Pa.1978) (later history omitted, decision essentially affirmed, *certiorari* denied). On August 17, 1978, in the Consummation Order and Final Decree (no party having mentioned PCBs in any filing), this Plan was confirmed and submitted for consummation on October 24, 1978. *In re Confirmation and Consummation of Plan of Reorganization (In re PCTC)*, 458 F.Supp. 1364 (E.D.Pa.1978) (later history omitted, decision essentially affirmed, *certiorari* denied).

In November 1978, EPA again visited and investigated PCB pollution at the Paoli Yard. The agency found that the use and disposal of PCBs violated then-current TSCA regulations.

This finding was communicated to Pennsylvania's Department of Environmental Resources (DER). DER evaluated the Railroad Yard, making five site visits from April through June, 1979. On June 28, 1979, DER ordered Conrail, AMTRAK, and the Southeastern Pennsylvania Transportation Authority (SEPTA) to clean up the PCBs. Enforcement of this order was opposed by Conrail, AMTRAK, and SEPTA, at least one appeal filed, and little if any cleanup doen before, on January 30, 1986, the Valley Forge Chapter of Trout Unlimited brought a citizens' suit in this district (Civil Action No. 86–595) to force cleanup of the Railroad Yard.

Meanwhile, the pending litigation to determine the amounts to be paid for PCTC's rail assets (and its related Tucker Act claims), were amicably settled (with no reference to PCB pollution) in an agreement dated November 16, 1980.

The agreement, in § 4.04, provided for releases of claims by PCC and the Government Parties, the United States and the United States Railway Association. PCC released "all claims ... against ... either of the Government Parties or any Transferee [of Rail Property], under ... any ... rule of law, whenever arisen or arising, whether for compensation or damages or other relief, ... on account of—(a) the transfer or conveyance ... of any ... interest in Rail Properties ... to Conrail ...; (b) transportation operations, before or after April 1, 1976, ...; (c) restrictions imposed by the Rail Act on the termination of rail services ... or on the abandonment of any Rail Properties ...; [and] (e) ... the form of consideration provided for in the Rail Act." The Government Parties released "any claim that the terms of transfer or conveyance of Rail Properties by [PCTC] ... were more fair and equitable than required as a constitutional minimum," a rather inartful release of claims that the government paid more than it was required to under the Rail Act and the Constitution. Both releases had exclusions not relevant here.

Throughout the period of the negotiations concerning valuation, in an immense federal effort that made daily headlines, Congress was directly confronting the problems caused by the dearth of federal and state laws to combat pollution in general and PCB pollution problems in particular. Eventually, in December 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*

On January 1, 1983, having previously entered into an operating agreement for the Paoli Yard under the Rail Act, 45 U.S. C. § 744(e), SEPTA took over commuter rail operations at the Yard. In 1984 and 1985, EPA and DER removed local soil and water samples that revealed significant PCB pollution.

This led to the above-mentioned Trout Unlimited lawsuit, and then to more lawsuits in this District, including:

*United States v. SEPTA et al.*, Civil Action No. 86–1094, seeking an injunction and clean-up costs under CERCLA, RCRA, and TSCA;

*Brown et al. v. SEPTA et al.*, Civil Action No. 86–2229, a purported class action (class certification denied) on behalf of persons who, having lived, worked, or owned or rented real property near the Railroad Yard since 1975, seek damages

and injunctive relief under CERCLA, TSCA, and Pennsylvania law;

*Burrell et al. v. SEPTA et al.,* Civil Action No. 86–2235, an individual action, similar to *Brown;*

*Cohen et al. v. SEPTA et al.,* Civil Action No. 86–4037, a purported class action (class certification denied) on behalf of people and businesses that, being near the Railroad Yard, seek damages and injunctive relief under CERCLA, TSCA, and Pennsylvania law;

*Narcise et al. v. SEPTA et al.,* Civil Action No. 87–1190, an individual action, similar to *Brown,* including claims under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.;* and

*Williams et al. v. SEPTA et al.,* Civil Action No. 87–1258, a purported class action similar to *Narcise.*

In all these cases, and in several related cases, defendants include AMTRAK and Conrail, as well as SEPTA.

SEPTA and Conrail now seek to bring third-party actions for contribution or indemnification from PCC; plaintiffs in the above-named cases seek to bring direct actions against PCC. All these proposed actions require leave of this Court to proceed because, in § 7.02 of the Consummation Order, I permanently enjoined the prosecution of lawsuits against PCC based on obligations of PCTC or PCTC's Trustees, and in ¶ 7.04 of the same order provided that the injunction would be lifted upon application in appropriate cases.

## II.

The Burrell petitioners, and perhaps others, allege that they wish to pursue claims based upon the post-consummation activities of PCC itself—claims, for example, that PCC, after coming into existence on October 24, 1978, tortiously concealed information about the PCB pollution at the Paoli Yard. Since the Consummation Order does not purport to preclude litigation against PCC for its own conduct, petitioners do not need this court's permission to proceed with such litigation. Whether such claims can be asserted without doing violence to Federal Rule of Civil Procedure 11 is not for this court to say.

## III.

There can be no doubt that the Consummation Order was intended to exonerate PCC from all claims in the categories of claims now being asserted in this proceeding. In accordance with normal bankruptcy practice, the reorganized company was to start with a clean slate, with only such liabilities and responsibilities as were inherent in the carefully structured Plan of Reorganization. And the Plan, in turn, was intended to achieve the compromise adjustment of a host of conflicting claims, giving to each its proper place in conformity with the absolute priority rule. The participants in the Plan proceedings would have been astonished to learn that there was or could be any group of claimants whose entitlements were not dealt with in or disposed of by the plan, and might survive the Consummation Order.

In the meantime, however, the Court of Appeals for the Third Circuit has decided, in *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936 (3d Cir.1985), that an FELA claim for asbestos-related injury which did not become manifest until after the Consummation Order in the Reading reorganization was not discharged by that Order. The court took the position that a claim for personal injury does not accrue until the injury has become manifest, and that the only "claims" which can be discharged are those which have accrued. The court cited with approval the decision of the Fifth Circuit Court of Appeals in *Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.),* 730 F.2d 367 (5th Cir.1984), to the effect that, for purposes of bankruptcy discharge, a products liability claim does not exist until the injury-producing accident has occurred.

To state that a claim is not discharged does not, of course, necessarily mean that there is an entity which can still be held legally liable to pay the claim, or that there are assets which may lawfully be looked to as a source of payment. In *In re Erie Lackawanna Ry. Co.,* 803 F.2d 881 (6th

Cir.1986), *rehearing denied* (1987), the Sixth Circuit Court of Appeals held that, if the § 77 debtor's plan of reorganization is a liquidation plan, *Schweitzer*-type asbestos claims which arose after confirmation could not be asserted against the reorganized successor of the § 77 debtor. On the other hand, in the *Schweitzer* case itself, my colleague Judge Ditter eventually determined that *Schweitzer* could proceed against the reorganized company.

Although the PCTC Reorganization Plan is much more complicated than either the Erie or the Reading plan, it bears many features which, under the Sixth Circuit's analysis in *Erie Lackawanna*, would militate against successorship liability. For example, unsecured creditors under the PCTC Plan received contingent debt securities in the amount of 30% of their claims, and stock for the balance of their claims. This form of distribution to unsecured creditors is normally associated with an insolvent company, and the mere fact that some of PCTC's assets passed to a new firm to be managed in the future would not necessarily justify a result different from that reached in the *Erie Lackawanna* case.

In addition to the successorship issues, there is room for the argument that, even if PCC bears no successorship liability, it would be inequitable not to make available to post-consummation personal injury claimants like these petitioners any undistributed PCTC assets which, under the terms of the Plan, were available for creditors, but which have not been needed for that purpose.

Notwithstanding the extensive briefing which has already occurred, and the inordinate delays in deciding this matter, the present record does not permit a definitive resolution of all aspects of the pending controversy. Although the parties have extensively discussed the *Schweitzer* case, they have not briefed the implications of the *Erie Lackawanna* decision, nor analyzed the PCTC Plan in light of that decision. And the facts concerning the amount of undistributed assets, if any, are not a matter of record.

■ I have therefore concluded that the parties should be invited to supplement the record in these respects. In the meantime, however, given the *Schweitzer* decision and the likelihood that at least some assets may be available as a fund for the payment of successful claimants, all of the petitioners will be permitted to pursue claims against PCC for personal injuries (including wrongful death), subject to certain conditions discussed below.

#### IV.

Before detailing the limitations on petitioners' right to proceed with personal-injury claims, it is appropriate to address the various other kinds of claims being asserted.

#### A.

■ All of the petitioners seek to pursue claims under CERCLA, including, variously, cleanup expenses, relocation costs, and compensation for personal injuries and property damage. In my view, however, PCC cannot be held liable under CERCLA for PCTC's alleged pollution; hence, no useful purpose would be served in permitting such suits to proceed.

CERCLA was not enacted until after PCTC's ownership and operation of the Paoli Yard came to an end, by operation of law. The statute carefully specifies the various types of entities potentially liable under that statute, in 42 U.S.C. § 9607(a), including:

(1) The owner and operator of ... a facility [such as the Paoli Yard],

(2) Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.

PCC does not fit within any of these definitions. The second category listed above does apply to PCTC, or would have if PCTC had still been in existence when the statute was passed. CERCLA creates retroactive liability for toxic waste disposal, *see Developments in the Law "Toxic Waste Litigation",* 99 Har.L.R. 1458, 1539–42 and n. 123 (1986) and is constitutional. *Id.* at 1555–65 and n. 69 (collecting cases). But the stat-

ute does not, at least expressly, purport to impose liability upon the reorganized successors of bankrupt former owners of pollution sources. And it would seem that, in the absence of some express statutory provision to that effect, a court should not readily assume that Congress intended any such result, which would be so disruptive of the scheme of the bankruptcy statutes and the expectations of the parties to bankruptcy proceedings.

Some further indication that Congress did not intend to create such retroactive liability can be derived from more recent legislation, the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). In that statute, in redefining the term "owner or operator", with respect to "any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of state or local government", Congress included for potential liability "any person who owned, operated or otherwise controlled activities at such facility immediately beforehand" but did not include the reorganized successor of any such person. P.L. No. 99–499, § 101(b)(2), 100 Stat. 1615 (1986) (codified at 42 U.S.C. § 9601(20)(A)(iii)). The previous version of the definition did not refer to conveyance "due to bankruptcy". When, as in the SARA amendments, Congress explicitly legislates on the subject of bankruptcy, it is reasonable to suppose that Congress has in mind the distinctions between the debtor and a reorganized successor. Thus, the failure to impose liability upon reorganized successors is a strong signal of Congressional intent.

And finally, it seems clear that the imposition of CERCLA liability is not required by the *Schweitzer* decision, directly or by analogy. *Schweitzer* dealt with liability-producing conduct of the debtor, which, after consummation, produced a noticeable injury. CERCLA involves activity of the debtor which was not potentially liability-producing (in the CERCLA sense) at the time it occurred, but which, after consummation, as a result of a change in the law, is deemed to have generated liability retroactively.

**B.**

*Claims under the Toxic Substances Control Act (TSCA).*

■ The Burrell petitioners, and perhaps other claimants who have adopted the Burrell assertions by reference, wish to pursue claims under the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* These claims have not been briefed, and may have been abandoned. In any event, they patently lack merit, and should not be pursued. The statute was enacted after PCTC's ownership and operation of the Paoli Yard had terminated by operation of law. Thus, there could be no possible TSCA liability unless the statute imposed such liability retroactively. On the contrary, the statute expressly provides, 15 U.S.C. § 2605(e)(2)(A) that "effective one year after January 1, 1977, no person may manufacture, process, or distribute in commerce or use any polychlorinated byphenol in any manner other than a totally enclosed manner." Neither PCTC nor PCC could possibly have violated this statute. Such claims will therefore not be permitted to proceed.

**C.**

*Claims of the United States, Conrail, SEPTA and Amtrak*

■ For convenience, the claims of Conrail, SEPTA and Amtrak will be referred to herein as the claims of Conrail (those of Amtrak and SEPTA being derivative therefrom).

To the extent that any party claiming damages for personal injury (including wrongful death) is now being permitted to sue PCC, the Conrail parties will be permitted to assert third-party claims for contribution.

To the extent that the Conrail parties wish to sue PCC for contribution or indemnity under the federal statutes discussed above, for the reasons already mentioned, such litigation will not be permitted to proceed.

In addition to these two kinds of claims, however, the Conrail parties seek to hold PCC liable, either directly or for contribution or equitable indemnity, for cleanup expenses and other forms of economic injury. The precise legal theory or theories

upon which these claims are based are somewhat elusive. When PCTC owned and operated Paoli Yard, it was spilling PCBs. PCTC conveyed the property to Conrail on April 1, 1976, and Conrail continued to spill PCBs thereafter. Both before and after the conveyance, the condition of the property was visible to all, and the existence of a PCB problem was certainly known to both sides.

If PCTC had been an ordinary private party, and had simply sold the property to Conrail as a private purchaser, would the fact that Conrail later incurred cleanup expenses and other liability relating in part to the preconveyance pollution give rise to any claim against PCTC? Under normal conveyancing law, the likelihood seems remote.

The possibility of any such claim being successfully pursued is certainly not enhanced by the fact that, instead of a private conveyance, the transfer to Conrail was the product of an exercise of eminent domain power by the United States Government. I am aware of no basis for suggesting that a party whose property has been condemned and paid for can later be held liable to the condemning authority for the pre-condemnation condition of the property.

In addition, the parties have failed to address the possible impact of the agreement settling the Valuation Case, and the releases which were exchanged in conjunction with that settlement. Apart from the CERCLA and TSCA statutes—which are unavailing here, as discussed above—it would seem that all of the claims of the Conrail parties may be simply a belated assertion that the Paoli Yard was worth less than PCTC was paid for it. If so, it is difficult to see how such a claim could survive the Valuation Case settlement.

Because of the potential magnitude of Conrail's claims, and because the issues have not been adequately addressed, I will permit further briefing on the subject. In the meantime, however, I am not per-suaded that the proposed litigation should be permitted to proceed, insofar as the claims of the Conrail parties are not predicated upon personal injury or wrongful death of third parties.

### D.

#### Claims for Punitive Damages

■ Some of the petitioners may wish to prosecute claims against PCC for punitive damages. Given the fact that the PCB problem was just beginning to be recognized at about the time PCTC's involvement in the railroad business was drawing to a close, and that no express statutory regulation existed at that time, it seems highly unlikely that PCTC itself could have been subject to a punitive-damage award. Be that as it may, however, I perceive no realistic basis, under *Schweitzer* or otherwise, for suggesting that PCC could properly be subjected to punitive damages in its alleged successorship role.

### E.

#### Claims for Damage to Adjacent Properties

■ Some of the petitioners wish to pursue claims for physical damage to adjacent properties by reason of the seepage of PCBs from the Paoli Yard beyond its borders. Obviously, as a predicate for possible liability of PCTC or its alleged successor, PCC, it would have to appear that the damage was caused by PCBs unleashed before April 1, 1976. And it would also have to be shown that the seepage to adjacent properties was not visible, and could not have been discovered with reasonable diligence, before October 24, 1978, and that suit is not time-barred.

In *In re Penn Central Trans. Co. (Petition to Pursue Antitrust Claims)*, 771 F.2d 762 (3d Cir.1985), the Court of Ap-

peals upheld this court's determination that certain antitrust claims were barred by the Consummation Order, notwithstanding claimants' assertion that they did not know of the existence of such claims until after the Consummation Order. The court, distinguishing *Schweitzer*, held that claimants' "claims" accrued when the defendant's conduct caused them an injury (rather than when they may have appreciated the legal theory supporting a lawsuit).

Unlike the personal injury claims discussed above, a claim for damage to adjacent property must be deemed to have accrued whenever the fact of seepage or spillage upon the adjacent property was manifested, regardless of whether the claimant then appreciated the nature and extent of the harm.

On the other hand, it is conceivable that all of the seepage complained of occurred underground and was not reasonably discoverable before the consummation date. Claims in that category will be permitted to proceed, on the same basis as the claims for personal injury.

### V.

*Limiting Conditions*

To the extent that litigation is being permitted against PCC at this time, the parties will be required to use their best efforts to structure the outcome of such litigation, whether by verdict or settlement, in such a way as to allocate specifically the amount of damages attributable to pre-April 1, 1976 discharge of PCBs. In the absence of such allocation, this court will, upon application, undertake to determine the appropriate allocation.

As discussed above, litigation will be permitted to proceed only on theories of common-law tort, and only for compensatory damages.

Finally, enforcement of any judgments or other form of award will be stayed, pending further order of this court.

An Order embodying these conclusions will therefore be entered.

### ORDER NO. 4811

AND NOW, this 14th day of January, 1988, upon consideration of the petitions of the respective plaintiffs, Conrail and SEPTA concerning the amenability of PCC to suit stemming from alleged PCB pollution at the Paoli Railroad Yard, it is ORDERED:

1. That, subject to the conditions and limitations set forth below, litigation to recover compensatory damages for personal injuries (including wrongful death) allegedly caused in whole or in part by exposure to PCBs released or discharged before April 1, 1976 may proceed against Penn Central Corporation, until further Order of this court, if such claim did not accrue before October 24, 1978.

2. Claims for compensatory damages for property damage to adjacent properties occasioned by the pre-April 1, 1976 discharge of PCBs at the Paoli Yard may likewise be pursued against PCC if the infiltration of PCBs to such adjacent property was not, and in the exercise of due diligence could not reasonably have been, known prior to October 24, 1978.

3. Suits in the above two categories may be maintained against PCC, either directly, or by way of third-party actions for contribution.

4. Potential recoveries from PCC in any such litigation will be limited to the damages properly allocable to PCB releases which occurred before April 1, 1976; the necessary allocation will be performed by this court, upon application. Claims for punitive damages may not be pursued against PCC.

5. Enforcement of any judgments or other recoveries, whether by execution or otherwise, is stayed, until further Order of this court.

6. Except as specifically provided above, ruling on the pending petitions is

deferred, pending further supplementation of the record, as follows:

a. Interested parties are directed to file supplemental briefs (which may include evidentiary submissions), within forty-five (45) days, addressing the implications of *In re Erie Lackawanna Ry, Co.*, 803 F.2d 881 (6th Cir.1986) and the Settlement Agreement in the Valuation Case and release documents, together with any additional issues they see fit to present.

b. PCC shall, within forty-five (45) days, submit a report showing the amounts, if any, of assets of PCTC set aside under the Reorganization Plan for distribution to creditors, but not needed for that purpose, and disclosing whether any of the claims sought to be asserted by petitioners would be covered by liability insurance.